UNITED STATES of America, Appellee,

v.

Kenneth O. BROWN, Appellant.

No. 75–1766.

United States Court of Appeals,
Eighth Circuit.

Submitted March 10, 1976.

Decided July 28, 1976.

Rehearing and Rehearing En Banc
Denied Aug. 20, 1976.

Alan G. Kimbrell, St. Louis, Mo., for appellant; Mortimer A. Rosecan, St. Louis, Mo., on brief.

Terry I. Adelman, Asst. U. S. Atty., St. Louis, Mo., for appellee; Donald J. Stohr (former U. S. Atty., effective May 15th, Barry A. Short, U. S. Atty.), St. Louis, Mo., David M. Rosen, St. Louis, Mo., on brief.

Before GIBSON, Chief Judge, HEANEY and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

Kenneth O. Brown appeals from his jury conviction on one count of interference with interstate commerce by extortion in violation of 18 U.S.C. § 1951 and six counts of mail fraud in violation of 18 U.S.C. § 1341. Concurrent sentences of three years imprisonment on each count were imposed. The issues presented by this appeal draw our attention to the circumstances under which the Hobbs Act and mail fraud statute may properly be employed to reach acts of self-dealing and faithlessness to public trust and responsibility by municipal officers.

The evidence upon which the government relied to obtain a conviction was as follows:

Brown was the Building Commissioner of the City of Saint Louis, Missouri, from 1961 to 1974. As administrator of the city building code, the Office of the Building Commissioner regulated construction contractors through a wide range of approval and inspection requirements. The office also maintained a listing of contractors who had qualified to perform building demolition work for the city by meeting ordinance requirements for license, bond, and insurance. Among his responsibilities, Brown approved demolition contractors as qualified to bid on city jobs; selected the contractors to whom bids on each demolition project were sent; opened the returned bids; approved the low bidder as qualified for the work; sent the award letter to the successful bidder; and approved payments to the contractor after completion of the project. Testimony indicated that because of the discretion and power of the office and the complexity of the rules it administered, contractors sought to maintain the best possible relationships with its personnel.

From 1966 to 1970 John Mincher and Howard Humphreys were the principal owners of Reliance Construction Company, a general contracting firm based in Florissant, Missouri. Reliance received raw materials through interstate commerce and engaged in construction projects outside of the State of Missouri. Humphreys was also employed as construction manager for the Mansion House Center, a large housing complex in Saint Louis. Mincher and Humphreys were acquaintances of Brown and dined with him about twice monthly.

Alma Rednour was a female acquaintance and intimate of Brown from 1965 until late 1972. In 1966, Rednour was looking for a new apartment and Brown asked her if she would like a residence in Mansion House. When she replied that she could not afford the rental payments, Brown told her that "it would be taken care of".

In early Fall, 1966, shortly after Reliance was formed, Brown asked Humphreys if he could obtain a "break" on a Mansion House apartment for Rednour. Humphreys arranged for an apartment and personally paid the rent from his own funds until February, 1967, at which time he informed Brown that his diminished financial status precluded further payments.

In March, 1967, Brown met with Mincher and Humphreys and suggested that Reliance enter the demolition contracting business. Brown stated that, as Building Commissioner, he handled the bidding on the city's demolition work and named the three contractors to whom invitations to bids would be sent on each project. Brown mentioned that he needed funds for an apartment rental at Mansion House, and that Reliance could serve as a conduit for those payments through profits from demolition business received from the city. As outlined by Brown, the actual demolition work would not be performed by Reliance, but by minority contractor Richard Thomas, who operated on a non-union basis and would thus work at a lower price than that actually paid by the city. Portions of this margin of profit would be used to pay Mansion House for rental of Rednour's apartment. Reliance would camouflage the payments by showing them on financial records as rent on its field office at Mansion House, which was in fact maintained rent-free because of services rendered to the apartment complex.

Mincher and Humphreys agreed to this proposition. According to their testimony, they feared that if they did not go along with Brown's scheme their general construction contracting would be subject to such adverse consequences by the Office of the Building Commissioner as administra-tive delays, denial of permit applications, difficulty in inspections, and other forms of harassment. The extent of Brown's actual ability to cause such consequences was hotly disputed at trial; the belief of Humphreys and Mincher that such consequences could occur was not disputed.

Reliance applied for and was placed on the list of approved demolition contractors and, with Thomas's assistance, began to receive and perform demolition contracts for the City of Saint Louis. Rental payments to Mansion House were mailed and camouflaged according to Brown's plan. Shortly after Reliance obtained its first demolition contracts, a business agent of the Teamsters Union informed Mincher that the use of non-union drivers by Thomas should be discontinued. When Brown's assurances of a solution failed to materialize and Teamster "threats" continued, Mincher decided to get out of the demolition business in order to prevent harm to Reliance's general contracting business and so informed Brown in late 1967. Brown met with Humphreys and Mincher and suggested that they form a new corporation to act for Reliance in the demolition business so that the unions would not know that Reliance was involved. Decco, Inc. was then formed by Mincher and Humphreys to replace Reliance in the demolition business. Decco at no time engaged in the demolition business outside the State of Missouri. Although Decco received the payments on its demolition contracts for the City, Reliance continued to mail the rental payments to Mansion House.

Humphreys and Mincher testified that, subsequent to their agreement to pay Rednour's rent, they began to receive better service from the Office of the Building Commissioner. In late 1970, however, they informed Brown that Decco was withdrawing from the demolition business. Mincher sold out to Humphreys and left Reliance; Decco was dissolved. In March 1971, the rental payments were terminated by Reliance. Since late 1967 approximately $11,500 had been paid by Reliance for the apartment. Brown did not at any time

disclose his interest in the Reliance and Decco demolition contracts to his superiors.[1]

Brown was indicted under 18 U.S.C. § 1951 for interference in interstate commerce by extortion of the rental payments from Reliance; and under 18 U.S.C. § 1341 on seven counts of mail fraud—four counts for causing the mailing of the rental checks by Reliance to Mansion House, and three counts for mailing the awards of demolition contracts to Reliance and Decco.

After full jury trial, Brown was convicted on the extortion count and all but one of the counts of mail fraud.[2] Brown appeals, asserting several claims of error, including a challenge to the sufficiency of the evidence. Upon a full review of the record, we affirm the judgment of conviction.

## I. EXTORTION

### A. *Sufficiency of the Indictment*

Count One of the indictment charged an extortionate scheme in violation of the Hobbs Act, 18 U.S.C. § 1951. A motion to dismiss the indictment was filed by Brown, including a challenge to Count One as insufficient and vague. A motion for a bill of particulars was concurrently filed pursuant to Fed.R.Crim.P. 7(f). In response to these motions, the government invited the attention of Brown to the totality of the indictment, contending that sufficient detail was present to enable adequate preparation of the defense. The District Court[3] denied both the motion to dismiss and the motion for a bill of particulars. Brown now contends that the District Court erred in not finding the indictment to be defective and compounded this error by refusing a bill of particulars.

Fed.R.Crim.P. 7(c)(1) provides that:

[T]he indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. * * * It need not contain * * * any other matter not necessary to such statement. * * *

Brown's argument on appeal is that he was misled by the indictment into thinking that extortion through "fear of financial and economic injury" and resulting unlawful effect upon commerce charged in the indictment related to the demolition business rather than to the construction business of Reliance.[4]

---

**1.** During all relevant time periods, Brown's conduct was subject to several state and local regulations concerning official misconduct. These statutes and ordinances were set forth in Counts Two through Eight of the indictment.

 Mo.Rev.Stat. § 106.300 provided in pertinent part:

 If any city officer shall be directly or indirectly interested in any contract under the city, or in any work done by the city, or in furnishing supplies for the city, or any of its institutions, he shall be deemed guilty of a misdemeanor.

 Mo.Rev.Stat. § 558.140 further provided:

 Every officer who shall, by color of his office, unlawfully and willfully exact or demand or receive any fee or reward to execute or do his duty, or for any official act done or to be done, that is not due, or more than is due, or before it is due, shall upon conviction be adjudged guilty of a misdemeanor.

 Section 41.040 of the Revised Code of the City of Saint Louis provided:

 The official duties of officers and employees of the City shall be performed for the benefit of the public only and shall be discharged faithfully regardless of personal considerations. No officer or employee shall, for private gain, grant any special consideration, treatment or advantage to any person. Nor shall any officer solicit or accept any payment or gift of money or any other thing of value for any service performed in his official capacity nor for the doing of any act which he is required by law to do.

**2.** The jury acquitted Brown on Count Two, the first of the seven mail fraud counts. During its deliberations, the jury sought information from the court as to whether Count Two was an extortion count or a mail fraud count; when counsel could not agree on a response, the District Court sent word that the jury should follow the instructions previously given. While uncertainty of the jury would be a likely explanation, we need not speculate on the jury's reason for acquitting on Count Two. *See United States v. Wetzel*, 488 F.2d 153, 155 (8th Cir. 1973).

**3.** The Honorable John F. Nangle, United States District Court for the Eastern District of Missouri.

**4.** 18 U.S.C. § 1951 provides in part:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in

An indictment must set forth in factual terms the elements of the offense sought to be charged. It must sufficiently apprise the defendant of what he must be prepared to meet, and its generality must not endanger his constitutional guarantee against double jeopardy. *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953); *United States v. Glup,* 482 F.2d 1288, 1289–90 (8th Cir. 1973); *United States v. Palmiotti,* 254 F.2d 491, 495 (2d Cir. 1958). The indictment in this case incorporates the three elements of an offense under 18 U.S.C. § 1951: (1) that the defendant induced his victims to part with property; (2) that he did so by extortionate means; and (3) that interstate commerce was thereby affected. The indictment establishes a time frame and identifies the victims, the property extorted, the methods of extortion, and the nature of the commerce affected. We think that appellant's argument that he was misled by the indictment in preparing his defense is wholly without merit. Likewise, the granting of a bill of particulars lies in the broad discretion of the trial court, *see Will v. United States,* 389 U.S. 90, 98–99, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967), and in view of the clarity of the indictment we cannot say that the District Court's refusal to grant the bill was an abuse of such discretion.

## B. *Sufficiency of the Evidence*

### 1. *The Extortionate Scheme*

Brown contends that the evidence was insufficient to establish the alleged "wrongful use of fear of financial and economic injury" and that his conduct was thus not shown to constitute extortion under the Hobbs Act. Brown would typify the evidence as establishing at most only the solicitation of a bribe without any evidence of fear or duress on the part of Reliance or its officers. *See United States v. Addonizio,* 451 F.2d 49, 72 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Kubacki,* 237 F.Supp. 638, 641–42 (E.D.Pa.1965).

18 U.S.C. § 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The final clause of this definition, positing extortion "under color of official right", is clearly written in the disjunctive. "That part of the definition repeats the common law definition of extortion, a crime which could only be committed by a public official, and which did not require proof of threat, fear, or duress." *United States v. Kenny,* 462 F.2d 1205, 1229 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176

commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
(b) As used in this section—
\* \* \* \* \* \*
(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
\* \* \* \* \* \*
Count One of the indictment reads in part:
4. That beginning in the summer of 1967, the exact date to the Grand Jury unknown, and continuing until on or about March 5, 1971, in the City of St. Louis, in the State of Missouri, and within the Eastern District of

Missouri, the defendant KENNETH O. BROWN did knowingly, willfully and unlawfully obstruct, delay and affect commerce and attempt to obstruct, delay and affect commerce, as that term is defined by Section 1951 of Title 18, United States Code and the movement of services, materials, equipment and supplies in such commerce by extortion, as that term is defined by Section 1951, Title 18, United States Code, in that the said defendant did obtain, directly and indirectly, the sum of $11,500.00, more or less, from Reliance Construction Company, its officers and agents, with the consent of Reliance Construction Company, its officers and agents, said consent having been induced by the wrongful use of fear of financial and economic injury and under color of official right in the defendant's capacity as Building Commissioner of the City of St. Louis.
In violation of Section 1951, Title 18, United States Code.

(1972).[5] *See United States v. Braasch,* 505 F.2d 139, 151 n.8 (7th Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *United States v. Crowley,* 504 F.2d 992, 994–95 (7th Cir. 1974).

■ Extortion "under color of official right" will thus be established whenever evidence shows beyond a reasonable doubt "the wrongful taking by a public officer of money not due him or his office, whether or not the taking was accomplished by force, threats or use of fear." *United States v. Kenny, supra,* 462 F.2d at 1229. As recognized in *United States v. Braasch, supra,* 505 F.2d at 151:

> It matters not whether the public official induces payments to perform his duties or not to perform his duties, or even * * to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951. That such conduct may also constitute "classic bribery" is not a relevant consideration. [footnote omitted]

■ Proof of extortion "under color of official right" thus requires a showing that the extorted party had at least a reasonable belief that the defendant had official power in the capacity through which the extortion was performed. There is no requirement, however, that the official have the actual power needed to perform an act which is the basis of the extortionate scheme. As stated by the Third Circuit in *United States v. Mazzei,* 521 F.2d 639, 643 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975):

> [I]n order to find that defendant acted "under color of official right," the jury need not have concluded that he had actual *de jure* power * * * so long as it found that [the extorted party] held, and defendant exploited, a reasonable belief that * * * the power in fact of defendant's office included the effective authority * * * here involved.

*See also United States v. Price,* 507 F.2d 1349, 1350 (4th Cir. 1974); *United States v. Staszcuk,* 502 F.2d 875, 878 (7th Cir. 1974), *adopted in part,* 517 F.2d 53 (7th Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). If the evidence then establishes that the payment by the extorted party was made to influence the real or apparent power of the public office, a violation of 18 U.S.C. § 1951 is proved. *See, e. g., United States. v. Kuta,* 518 F.2d 947, 950 (7th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *United States v. Price, supra,* 507 F.2d at 1350; *United States v. Staszcuk, supra,* 502 F.2d at 878.

■ The evidence in the present case, viewed as it must be in the light most favorable to the jury verdict, *see Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Giblin v. United States,* 523 F.2d 42, 44 (8th Cir. 1975), clearly establishes extortion "under color of official right". Brown held the office of Building Commissioner of the City of Saint Louis, and thus headed an agency with significant regulatory power over the activities of construction contractors within the city limits. Mincher and Humphreys were shown, as owners of Reliance, to be concerned with maintaining a friendly relationship with Brown because of his office. The testimony of Mincher and Humphreys indicated that, although they did not desire to perform demolition work, they entered the

---

**5.** In *United States v. Kenny,* 462 F.2d 1205, 1229 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972), Judge Gibbons observed that in *United States v. Addonizio,* 451 F.2d 49 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), relied upon by Brown, only extortion by fear was submitted to the jury, although the "under color of official right" theory had also been charged. This explains the court's statement in *Addoni-* zio that "the essence of extortion is duress". Judge Gibbons further observed:

> [W]hile private persons may violate the statute only by use of fear and public officials may violate the act by use of fear, *persons holding public office may also* violate the statute by a wrongful taking under color of official right. [emphasis added]

462 F.2d at 1229.

rental payment scheme proposed by Brown because of their concern that the consequences of their refusal would be retribution from Brown's office in the guise of regulation of their construction business.[6] Mincher and Humphreys further testified that they received improved services from the Office of the Building Commissioner after the initiation of the scheme. This evidence, if believed, was sufficient to establish the element of extortion as charged in the indictment.

### 2. Effect on Interstate Commerce

Brown also contends that an effect upon interstate commerce was not established by the evidence. It is his theory that since the apartment rental was ultimately paid from the profits of the purely intrastate demolition business of Decco, there would not have been any effect on interstate commerce had Humphreys and Mincher not paid the rent through Reliance. We find this argument to be specious. Decco was an offshoot of Reliance, formed at Brown's suggestion to avoid detrimental effects to Reliance's general contracting business from the use of non-union workers on demolition projects. The scheme clearly contemplated the continued payments by Reliance as pretextual rent for the office it would otherwise have been permitted to occupy at Mansion House without charge. Having devised this scheme, Brown cannot now be heard to contend that the formation of Decco operated to insulate him from the effects of that which he had instigated: extortionate payments by a company engaged in interstate commerce. Extortion practiced upon the principals of a business is clearly harmful to that business and a resulting interference with interstate commerce "in any way or degree" is outlawed by the Hobbs Act. *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Biondo,* 483 F.2d 635, 640 (8th Cir. 1973), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974). The close interrelationship of the principals and their two companies, Reliance and Decco, was such that it was a "realistic probability" that the diminishing of Reliance's assets through the rental payments would have an effect upon commerce. *See United States v. Mazzei, supra,* 521 F.2d at 642; *United States v. Staszcuk, supra,* 517 F.2d at 59–60; *United States v. Mitchell,* 463 F.2d 187, 190 (8th Cir. 1972), *cert. denied,* 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973).

### II. MAIL FRAUD

### A. The Scheme to Defraud

Brown next contends that the evidence was insufficient to support the jury verdicts of violation of 18 U.S.C. § 1341. As this Court recently recognized in *United States v. McNeive,* 536 F.2d 1245, at 1247 (8th Cir. 1976):

> For the Government to establish a violation of § 1341, it must prove "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *see United States v. Nance,*

---

**6.** Although the primary theory of the government's case was extortion "under color of official right", the evidence was also sufficient to establish the more common extortion "by wrongful use of actual or threatened force, violence, or fear". Such fear must of course be reasonable in order to establish extortion by its use. *See United States v. Quinn,* 514 F.2d 1250, 1266–67 (5th Cir. 1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976); *United States v. DeMet,* 486 F.2d 816, 819–20 (7th Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The testimony of Mincher and Humphreys was that they were placed in fear of economic loss to their construction business through harassment from the Office of the Building Commissioner if they failed to comply with the rental payment scheme. Brown argues that the evidence did not show that he could have arbitrarily delayed or denied building permits or otherwise have caused harm to the business of Reliance. A defendant need not be shown to have actual ability to produce anticipated harm, however, as long as the victims reasonably believe such harm may result through the acts of defendant. *United States v. Emalfarb,* 484 F.2d 787, 789 (7th Cir.), *cert. denied,* 414 U.S. 1064, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973). The evidence of fear of economic injury was in any event sufficient to submit the issue to the jury.

502 F.2d 615, 618 (8th Cir. 1974), *cert. denied,* 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975). Since the term "scheme to defraud" connotes some degree of planning by the perpetrator, it is essential that the evidence show the defendant entertained an intent to defraud. *United States v. Nance, supra* at 618.

▪ It is now well established in this Circuit that proof of a violation of 18 U.S.C. § 1341 does not require evidence that a deceptive scheme was intended to defraud individuals of money or other tangible property interests. *See United States v. States,* 488 F.2d 761, 764–66 (8th Cir. 1973), *cert. denied,* 417 U.S. 909, 950, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974). A deceptive scheme will be held violative of 18 U.S.C. § 1341 if it is shown to operate to deprive individuals of significant intangible rights or interests. *Id. See also United States v. Isaacs,* 493 F.2d 1124, 1149–50 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974); *United States v. George,* 477 F.2d 508, 512–13 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973). Applying this standard, it has been held in recent years that a public official may be prosecuted under 18 U.S.C. § 1341 if he devises a scheme whereby bribes or kickbacks are accepted in the course of conduct of his office, since such conduct operates to defraud the citizens of his government of their right to his honest and faithful services. *See United States v. Bush,* 522 F.2d 641, 646–48 (7th Cir. 1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v. Keane,* 522 F.2d 534, 546–50 (7th Cir. 1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Barrett,* 505 F.2d 1091, 1103–04 (7th Cir. 1974), *cert. denied,* 421 U.S. 964, 93 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Isaacs, supra,* 493 F.2d at 1150; *United States v. Faser,* 303 F.Supp. 380, 384–85 (E.D.La.1969). *Cf. United States v. George, supra,* 477 F.2d at 512–13.

There is, of course, an outer limit to the use of the federal mail fraud statute to reach fiduciary breaches by government officials. In *United States v. McNeive, supra,* 536 F.2d at 1249–1253, we reviewed the successful prosecution of the former Chief Plumbing Inspector of Saint Louis for the receipt by mail of unsolicited gratuities for the performance of ministerial tasks. In the absence of evidence that McNeive accorded preferential treatment to the payor of the gratuities or otherwise did not conscientiously perform the duties of his office, we held that McNeive's conduct in accepting unsolicited gratuities could not be held a "scheme to defraud" within the meaning of the statute.

The evidence in this case, however, is of a substantially different nature. While we agree with Brown that his conduct did not resemble the typical scenario in a mail fraud prosecution, we note the statement of the Seventh Circuit in *United States v. Bush, supra,* 522 F.2d at 646:

> [I]t has become well established that the mail fraud statute is violated when some or all of the following factors are present: a duty to disclose an interest with a concomitant failure to do so; an attempt to cover-up through false pretenses; a taking of money or property or rights of another through the use of kickbacks, extortion, bribery, tax evasion, perjury, or a violation of some state or federal statute; a use of the United States mails.

▪ Each of these factors was present in the instant case. By initiating and participating in the rental payment scheme, Brown acted in apparent contravention of Mo.Rev.Stat. § 106.300, which provides criminal penalties for a city officer who obtains any interest, direct or indirect, in a city contract or any work performed by the city.[7] Moreover, the profits from the demolition contracts were intended to benefit Brown, and failure to disclose this interest

---

7. *See* note 1, *supra.* A conviction for mail fraud is, of course, not dependent upon a violation of state law. *See United States v. States,*

488 F.2d 761, 767 (8th Cir. 1973), *cert. denied,* 417 U.S. 909, 950, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

to his employer was further evidence of a scheme to defraud:

> [A]n employee owes his employer a duty of loyalty which includes a duty not to conceal facts known to him which he has reason to believe are material to the employer's conduct of its business and affairs. Thus, [a government official's] duty to disclose need not be based upon the existence of some statute prescribing such a duty.

*United States v. Bush, supra,* 522 F.2d at 652. *See Blachly v. United States,* 380 F.2d 665, 763–74 (5th Cir. 1967). Brown at no time disclosed his interest in the contracts to his superiors, despite the fact that the existence of such interest was patently material to the business of the city. Moreover, Brown actively concealed the scheme by instructing Reliance to camouflage on its books the rental payments made for his benefit as paid for an office which Reliance maintained rent-free at Mansion House.

■ Brown's arrangement for Reliance and later Decco to enter the demolition contracting business and then pay profits on city contracts as camouflaged rental payments can thus only be characterized as a scheme or artifice to defraud the citizens of Saint Louis of Brown's disinterested conduct in the Office of the Building Commissioner. Unlike the situation in *McNeive,*

Brown was the instigator of the rental payment arrangement. He managed the scheme and, when Mincher and Humphreys decided to withdraw because of potential problems with labor unions, he assured its continuance by suggesting· the creation of Decco. Finally, he affirmatively acted to conceal his violation of state standards for honest and faithful services. There was thus substantial evidence from which the jury could find that the government had established the existence of a scheme to defraud devised by Brown.[8]

### B. *Use of the Mails*

■ Brown contends that even if a scheme to defraud was demonstrated by the evidence, there was insufficient evidence to establish the use of the mails in respect to this scheme. 18 U.S.C. § 1341 does not require proof that the defendant actually utilized or intended to utilize the mails as part of the alleged deceptive scheme. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954); *United States v. Brickey,* 296 F.Supp. 742, 747–48 (E.D.Ark.1969), *aff'd,* 426 F.2d 680 (8th· Cir.), *cert. denied,* 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970). The mailing element of the crime instead consists of two requirements: (1) that the defendant caused the use of the mails and (2) that this use was

---

**8.** Other challenges to the existence of a scheme to defraud may be dealt with summarily:

Brown complains of the absence of proof of false representations in regard to the scheme to defraud. 18 U.S.C. § 1341 contains a series of independent acts of fraud involving use of the mails. One of these is "obtaining money or property by means of false or fraudulent pretenses, representations, or promises". Another, the offense charged here, involves devising "any scheme or artifice to defraud". The former requires proof of false representations; the latter does not. *United States v. States,* 488 F.2d 761, 763–64 (8th Cir. 1973), *cert. denied,* 417 U.S. 909, 950, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

Brown also contends that the grand jury indictment alleged preferential treatment of Reliance and Decco as an essential element of the scheme to defraud and that, since the evidence showed that he did not legally possess the discretion to accomplish favoritism, there was no proof of preferential treatment and thus

there was a prejudicial variance from the indictment. While the indictment alleges that the deceptive scheme was devised to defraud the City of Saint Louis and its citizens of, among many other things, "their right to * * unbiased services * * * in the performance of official duties of the defendant * * * free from * * * partiality [and] bias * * *" and "their right to have the City's business and its affairs conducted * * * impartially * * *", a fair reading of the full indictment shows that the language concerned Brown's self-interest in the transactions with Reliance and Decco. There is no specific allegation that the deceptive scheme was intended to provide preferential treatment for Reliance or Decco. Furthermore, whether or not the indictment may be construed to allege such treatment, the testimony of Mincher and Humphreys was clear that they did in fact receive improved and, in their belief, preferential treatment after the rental payment scheme began.

"for the purpose of executing" the deceptive scheme. *See United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Kann v. United States*, 323 U.S. 88, 93–95, 65 S.Ct. 148, 89 L.Ed. 88 (1944).

### Counts Three-Five

Brown contends that the evidence failed to demonstrate that the mailings alleged in Counts Three through Five—the rental payment checks mailed by Reliance to Mansion House—were reasonably foreseeable or caused by him. In *Pereira v. United States, supra*, 347 U.S. at 8–9, 74 S.Ct. 358, the Supreme Court held that the causation requirement of 18 U.S.C. § 1341 would be fulfilled even where a defendant did not intend the use of the mails if such use was a reasonably foreseeable result of his actions. Even if the only mailing emanates from a non-defendant, the defendant will be held to have caused the mailing if the mails were the only reasonable means of communication available to the sender or the mailing was otherwise reasonably foreseeable to defendant. *Id.*; *United States v. Minkin*, 504 F.2d 350, 353–54 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975). *Cf. United States v. Kenofskey*, 243 U.S. 440, 442–43, 37 S.Ct. 438, 61 L.Ed. 836 (1917).

While there is no evidence in the record that Brown specified that the checks be sent by mail, the evidence does reveal that Brown prevailed upon Mincher and Humphreys to have Reliance pay Mansion House for the monthly apartment rentals; that nearly all transactions between Brown's office and Reliance and Decco were by mail; that Brown's office communicated with Reliance at its Florissant, Missouri, office; and thus that Brown was on notice that transfer of funds from Reliance to Mansion House by mail rather than by hand delivery was a reasonable possibility. This was sufficient evidence from which the jury could find that Brown caused the use of the mails to accomplish the ultimate objective of the scheme.

### Counts Six-Eight

Brown argues that the evidence did not show that the mailings alleged in Counts Six through Eight—the "award letters" mailed by Brown to Decco—were used "for the purpose of executing" the scheme. There was, however, clear evidence from which the jury could find that the scheme, which involved obtaining demolition contracts from the city, would foreseeably involve correspondence between the city and Reliance and/or Decco. The process of generating the funds to make the rental payments included obtaining demolition contracts, and the notices of award were thus a link in the chain by which the scheme was to be accomplished. The statutory requirement that a defendant use the mails "for the purpose of executing" the deceptive scheme does not mandate that the mailings be either an essential element in the scheme, *Pereira v. United States, supra*, 347 U.S. at 8, 74 S.Ct. 358; *United States v. Nance*, 502 F.2d 615, 618 (8th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975); *United States v. Brickey, supra*, 296 F.Supp. at 747–48, or actually successful in its execution. *United States v. Gross*, 416 F.2d 1205, 1209–10 (8th Cir. 1969), *cert. denied*, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970); *Pritchard v. United States*, 386 F.2d 760, 766 (8th Cir. 1967), *cert. denied*, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). There must, however, be evidence that the mailings were "sufficiently closely related to [the] scheme to bring [defendant's] conduct within the statute." *United States v. Maze, supra*, 414 U.S. at 399, 94 S.Ct. at 648.

The letters which were the subject of Counts Six through Eight were in the nature of a form and provided in pertinent part:

Attached is a copy of your approved proposal. Present the approved proposal with this letter to the office of the cashier across from Room 426, City Hall as your authority to sign the required agreement forms and enter into a contract for the removal of the building described above.

This letter, the approved form of bid, form of bond and insurance, and the *signed* agreement form, and form of non-collusion affidavit, can be considered your contract to proceed in obtaining a permit and perform work described there-on. [emphasis original]

■■■ The award letters were thus considered by the Office of the Building Commissioner to be a part of the demolition contracts and a prerequisite to executing the agreements. We think the mailings therefore bore a sufficiently close relationship to the scheme to meet the requirement of the statute.

Brown next contends that notwithstanding the relationship of the mailings to the scheme, these mailings were part of his duties as Building Commissioner and were thus immune from prosecution under *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1969). In *Parr*, trustees of a local school board were charged with mail fraud and conspiracy to commit mail fraud based upon their misappropriation and embezzlement of tax assessments. The prosecution charged that the mailing of the otherwise legal tax assessments, which was required of the trustees by state law, was nevertheless "for the purpose of executing" a mail fraud scheme. The Supreme Court reversed the convictions, stating: "[I]t cannot be said that mailings made or caused to be made under the imperative command of duty imposed by state law are criminal under the federal mail fraud statute * *." *Id.* at 391, 80 S.Ct. at 1183. This statement, however, placed great reliance on the fact that the tax assessments were legitimate and mailed to individuals who were not involved in the deceptive scheme. ·

■■■ In this case, there was no legal requirement that the awarding of demoli-

tion contracts be conducted by mail. Although it was Brown's official duty to award the contracts to the lowest legitimate bidder, the use of the mails to accomplish this purpose was a business practice rather than a requirement imposed by local law. The limited immunity defense recognized in *Parr* is thus not applicable in this case.

■■■ We therefore hold that there was sufficient evidence to support a verdict of conviction on each of the six counts brought under 18 U.S.C. § 1341.[9]

### III. FAIR TRIAL

#### A. *Motion for Change of Venue*

■■■ Brown contends that he was denied a fair trial by the failure of the District Court to sustain his motion for a change of venue because of pretrial publicity. Such a motion is addressed to the sound discretion of the District Court, Fed.R.Crim.P. 21(a), and should not be granted merely upon a showing of widespread or adverse pretrial publicity. *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *United States v. McNally*, 485 F.2d 398, 402–03 (8th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1566, 39 L.Ed.2d 874 (1974).·

■■■■ It is fundamental that a defendant is entitled to have his guilt determined by a fair and impartial jury. The ability and willingness of jurors to remain impartial and to form a judgment without reference to what has been said or written about a case outside the courtroom are necessary subjects to be addressed on voir dire when there has in fact been pretrial publicity regarding the ·case. It is entirely within the court's discretion to defer ruling on a motion for change of venue based upon prejudice of the community until it can test that charge by examining the panel drawn

---

9. Even if our reliance upon the sufficiency of the evidence is misplaced as to any or all of the mail fraud counts, reversal would not be warranted because no prejudice has been shown. Brown's sentences under Count One and Counts Three through Eight were concurrent. Thus his conviction under Count One supports the sentence and judgment under the concurrent sentence doctrine. *See United States v.*

*Simone*, 495 F.2d 752, 753–54 (8th Cir. 1974); *United States v. Irby*, 480 F.2d 1101, 1102 (8th Cir. 1973); *Kilcrease v. United States*, 457 F.2d 1328, 1331 (8th Cir. 1972). We perceive no prejudice from the application of that doctrine in the present case. *See Sanders v. United States*, 541 F.2d 190, at 193–194 (8th Cir. 1976).

to hear the case. *See United States v. McNally, supra,* 485 F.2d at 402–03. Mere exposure to publicity or the formation of tentative impressions by some jurors is not enough to require a change of venue. The ultimate test is whether a juror has been exposed to pretrial publicity and, if so, whether he or she can set aside any impression or opinion resulting from that exposure and render a verdict based solely on the evidence presented at trial. *See Irvin v. Dowd, supra,* 366 U.S. at 722–23, 81 S.Ct. 1639; *United States v. Delay,* 500 F.2d 1360, 1365 (8th Cir. 1974); *United States v. McNally, supra,* 485 F.2d at 403. As we demonstrate below, a jury able to meet that test was impanelled. The District Court thus properly exercised its discretion in denying the motion pending voir dire.

## B. Adequacy of Voir Dire

Brown next contends that the scope and manner of voir dire on the impact of pretrial publicity were insufficient to test the impartiality of the individual members of the jury panel.

The prosecution of Brown followed an intensive investigative reporting effort by the Saint Louis press and it was understandably attended by substantial newspaper publicity. This prompted Brown to file a pretrial motion requesting the District Court to determine on voir dire which jury panelists recalled exposure to publicity and then to examine such members of the panel

individually on this subject outside of the hearing of other panelists.[10] The motion was denied, and the District Court proceeded to conduct the voir dire itself. Brown argues that the denial of the motion was error and that the District Court's voir dire was wholly inadequate to guarantee the impanelling of a fair and impartial jury.

Under Fed.R.Crim.P. 24(a), the District Court had broad discretion to conduct the voir dire, and error will be found only if an abuse of that discretion resulted in substantial prejudice to the defendant. *See United States v. Crow Dog,* 532 F.2d 1182, 1198 (8th Cir. 1976); *United States v. Liddy,* 166 U.S.App.D.C. 95, 509 F.2d 428, 434–35 (1974); *United States v. Bear Runner,* 502 F.2d 908, 911–12 (8th Cir. 1974); *United States v. Nance, supra,* 502 F.2d at 620.

The District Court questioned the panel generally as to whether any of them had been exposed to the publicity surrounding the prosecution. Only seventeen of the forty-four members of the panel responded in the affirmative. These seventeen panelists were then asked individually whether what they had read or heard regarding the case would render it "difficult" for them to be "totally fair and impartial" jurors. None answered in the affirmative.[11] The District Court further inquired as to whether these panel members would require additional evidence of innocence to overcome the effect of any publicity they had encountered and

**10.** This motion was based upon the procedures recommended in American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.4 (1968):

It is recommended that the following standards be adopted in each jurisdiction to govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised.

(a) Method of examination.

Whenever there is believed to be a significant possibility that individual talesmen will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to his exposure shall take place outside the presence of other chosen and prospective jurors. * * The questioning shall be conducted for the

purpose of determining what the prospective juror has read and heard about the case and how his exposure has affected his attitude towards the trial, not to convince him that he would be derelict in his duty if he could not cast aside any preconceptions he might have.

\* \* \* \* \* \*

**11.** The record reflects some considerable shifting between general questions and individual questions making it somewhat difficult to find clearcut denials of partiality from each juror who admitted to having read or heard about the case. The District Court made an earnest and, we think, sufficient effort to reach and bring forth any latent prejudices which the jurors might have been harboring. We do not understand Brown to contend that any particular juror's response was inadequately dealt with by the District Court.

whether they would be unable to afford Brown his entitled presumption of innocence. Again, there was no indication that the publicity had had a prejudicial effect on the panelists.[12]

■■■■ The District Court established by its preliminary questioning that there was no significant possibility that individual panelists would be ineligible because of the effects of pretrial publicity.[13] While a more pervasive atmosphere of prejudicial publicity might warrant resort to such procedure, *see, e. g., Patriarca v. United States*, 402 F.2d 314, 318 (1st Cir. 1968), *cert. denied*, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *Silverthorne v. United States*, 400 F.2d 627, 639–40 (9th Cir. 1968),[14] especially if the trial judge could not assure himself that the jurors were able and willing to answer his preliminary questions in candor, we find no abuse of discretion or prejudicial error in the voir dire procedure followed in this case.[15]

## C. *Failure to Strike Jurors for Cause*

Brown next contends that the District Court erred in overruling his motion to strike for cause those members of the jury panel who were citizens of the City of Saint Louis. Citing the language of the indictment which charged him with devising a scheme to defraud the "City of St. Louis *and its citizens*" (emphasis added), Brown argues that such persons should have been stricken from the panel since they were the victims of the alleged fraud. This contention is without merit.

■■■■ Rulings on the qualifications of jurors will not be interfered with on appeal absent a clear showing of abuse of the sound discretion vested in the district court. *United States v. Freeman*, 514 F.2d 171, 174 (8th Cir. 1975). Absent a showing of actual bias, the attenuated relationship claimed here does not justify relief. *See United States v. Kelton*, 518 F.2d 531, 533 (8th Cir.), *cert. denied*, 423 U.S. 1021, 96 S.Ct. 460, 46 L.Ed.2d 394 (1975). In any event, the District Court carefully examined the potential jurors as to their feelings of bias or prejudice and was satisfied that there was no actual bias or prejudice. We find no abuse of discretion.

12. Only two prospective jurors were dismissed for cause, and these dismissals were unrelated to pretrial publicity. The District Court also granted defense counsel one additional peremptory challenge.

13. In the absence of a showing of a "significant possibility" that individual panelists would be ineligible because of the effects of pretrial publicity, the ABA Standards would not require individualized and segregated voir dire. *See* note 10, *supra*. Thus, even if the ABA Standards were applicable, the refusal of the District Court to conduct individualized and segregated voir dire would not have been error. *See United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428, 435 (1974).

14. In *Patriarca v. United States*, 402 F.2d 314 (1st Cir. 1968), *cert. denied*, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969), the district court had failed to question the prospective jurors further after receiving absolutely no response from any panelists on its single question regarding the effect of publicity on their ability to act impartially. The First Circuit found that "such a single question posed to the panel en bloc, with an absence of response, achieves little or nothing by way of identifying, weighing, or removing any prejudice from prior publicity." *Id.* at 318. Although no error was found under the circumstances of the case, individualized and segregated voir dire was recommended for future situations of a similar nature.

In *Silverthorne v. United States*, 400 F.2d 627, 635–40 (9th Cir. 1968), *every* panelist indicated that he or she had been exposed to pretrial publicity, but the district court merely obtained assurances of impartiality. The Ninth Circuit held that this voir dire was inadequate and an abuse of discretion, stating that, in light of the prejudicial nature of certain of the publicity, the preferred procedure would have been that of individualized and segregated voir dire.

15. We also hold that the District Court did not abuse its discretion in refusing to allow Brown's counsel to conduct voir dire on the issue of publicity. We think it appropriate to note that defense counsel had agreed before trial that voir dire on the issue of publicity was to be conducted in the manner followed by the District Court, to be supplemented by questions submitted by counsel. Some questions submitted by counsel were asked. Brown does not point to any requested inquiry which was not covered sufficiently by the District Court. *Compare United States v. Bear Runner*, 502 F.2d 908, 910–13 (8th Cir. 1974).

## IV. OPENING STATEMENT

 Brown challenges the opening statement of the government because the prosecutor indicated that a witness would be called to testify that she was Brown's girlfriend from 1966 to 1972 "although he was married during that time". A motion for mistrial was entered at the conclusion of the opening statement. While the timeliness of this motion is open to doubt, *see United States v. Ward*, 481 F.2d 185, 187 (5th Cir. 1973), we dispose of this contention on its merits. The District Court admonished the jury to disregard the mention of the marriage on the ground that it was of no relevance to the issues of the case, and gave the usual instruction that the opening statements of counsel were not to be considered as evidence. Alma Rednour subsequently testified for the government and substantiated this portion of the opening statement.

The government's reference to the extramarital conduct of Brown was apparently directed to the motive for Brown's actions in devising the rental payment scheme which was the subject of the prosecution. While we note the potential danger in such a reference, we find no evidence of improper conduct by the prosecutor and no prejudicial error in the opening statement.

## V. INSTRUCTIONS

Brown has also mounted a detailed assault upon the District Court's charge to the jury. Much of his argument parallels his challenge to the sufficiency of the indictment on the Hobbs Act count and the sufficiency of the evidence on all counts, with which we have dealt elsewhere in this opinion. We are satisfied, upon an examination of the entire record, that the instructions, taken as a whole, fairly and fully advised the jury of its duty under the applicable law of the case. We address ourselves, however, to three of Brown's contentions which merit discussion.

### A. *Position Instruction*

Brown contends that he was denied a fair trial by the refusal of the District Court to submit to the jury the following position instruction on his theory of the defense:

It is defendant's position that he did not know that Reliance Construction Company was paying the rent on Alma Rednour's apartment. Unless you find and believe from the evidence beyond a reasonable doubt that defendant knew that the rent on Alma Rednour's apartment was being paid by Reliance Construction Company, you shall find the defendant not guilty on all counts.

 A defendant is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request is entered. *United States v. Nance, supra*, 502 F.2d at 619; *Apel v. United States*, 247 F.2d 277, 282 (8th Cir. 1957). *See generally* 8A J. Moore, Federal Practice ¶ 30.03[1] (2d ed. 1976). Even if the requested instruction is proper and in form suitable for use by the court, the court retains discretion in framing the instruction; it is therefore sufficient that the charge to the jury adequately and correctly covers the substance of the requested instruction. *United States v. Wixom*, 529 F.2d 217, 219–20 (8th Cir. 1976); *United States v. Nance, supra*, 502 F.2d at 619–20; *Wright v. United States*, 175 F.2d 384, 388 (8th Cir.), *cert. denied*, 338 U.S. 873, 70 S.Ct. 143, 94 L.Ed. 535 (1949).

When Brown objected to the refusal of the District Court to submit the proffered instruction, the court replied:

I will give you an opportunity, if you have a more properly worded instruction, if you want to call it a position instruction, but I think that just singles out certain things and I think that point has been adequately covered legally so that you can likewise argue the points you want to make.

Despite the court's offer to submit a proper instruction, Brown failed to tender a revised instruction.

 We think the instructions, taken as a whole, adequately advised the jury of the essential elements of the offenses charged and the burden of the prosecutor in proving

the knowledge of the defendant, from which Brown's experienced counsel could argue his defense to the jury. While trial judges should be liberal in permitting the defendant's theory of defense to be explained to the jury, since such an instruction is a legitimate response to the indictment which is usually read with the instructions, it does not follow that failure to give such an instruction requires reversal in the absence of prejudice. Given the full instructions of the court, we are satisfied that no prejudice resulted here.[16]

## B. *Use of State and Local Statutes*

■ Brown contends that the District Court erred in instructing the jury on the use of state and local statutes, because an impermissible inference of guilt from evidence showing violation of the statutes could have resulted. The instruction given, however, directed the jury that these statutes, indicative of the standard of conduct expected of Brown as a city official, could be considered merely as relevant to the intent of the defendant. This was a proper statement of the law. *See United States v. Barrett, supra*, 505 F.2d at 1104–05, nn.12, 13. This contention is therefore without merit.

## C. *Statute of Limitations*

Brown alleges error in the fact that the District Court instructed the jury that he could be convicted only for crimes committed within the statute of limitations, and yet failed to inform the jury of the date on which the indictment tolling the statute of limitations was returned. The District Court stated:

The Court instructs you that defendant can only be convicted of crimes which you may find he committed within five years preceding the indictment. In this connection you are instructed that in regard to Count I of the indictment the government must prove that the defendant began to extort money from Reliance Construction Company on or about the summer of 1967 and that he continued to do so until on or about March 5, 1971.

\* \* \* \* \* \*

The Court instructs you that defendant can only be convicted of crimes which you may find he committed within five years preceding the indictment. In this connection, you are instructed that in regard to Counts Two–Eight of the indictment the government must prove that on or about the summer of 1967 defendant devised and intended to devise a scheme and artifice to defraud the City of St. Louis and its citizens and that this scheme continued in existence until on or about March 5, 1971.

■ Brown did not object to this omission from these instructions, which in other respects were a proper statement of the law. The charge to the jury set forth a

---

16. The District Court's instructions included the following:

Four essential elements are required to be proved in order to establish the offense of extortion charged in Count One of the indictment:

First: That the defendant induced Reliance Construction Company through Howard Humphreys and John J. Mincher to part with property;

Second: That he did so by extortion as defined in these instructions;

Third: That he did so *knowingly and willfully*;

Fourth: That in doing so, interstate commerce was obstructed, delayed or affected. [emphasis added]

\* \* \* \* \* \*

[In regard to Counts Two through Eight]: [I]t is necessary that the evidence in the case establish beyond a reasonable doubt that the letter was willfully mailed, or caused to be mailed, by the accused, with the intent to help carry out some essential step in the execution of the scheme to defraud alleged in the indictment.

To act with "intent to defraud" means to act knowingly and with the specific intent to deceive others out of something to which they are entitled.

\* \* \* \* \* \*

The crimes charged in the indictment are crimes which require proof of specific intent before the defendant can be convicted. \* \* To establish specific intent the government must prove that the defendant knowingly did an act which the law forbids, purposely [sic] intending to violate the law.

relevant time period for the jury's consideration well within the applicable limitations period. Moreover, Brown does not demonstrate, and we cannot ascertain, any prejudice which may have resulted from the omission.

## VI. CONCLUSION

Our review of the record and the legal issues presented convinces us that Kenneth Brown received a fair trial before an impartial jury and that the evidence was sufficient to submit the issues to the jury. We find no prejudicial error and affirm the judgment of conviction.