**UNITED STATES of America, Appellee,**

v.

**John David BARTLETT, Appellant.**

**No. 87–5244.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1988.

Decided Sept. 8, 1988.

Laurence J. Zastrow, Pierre, S.D., for appellant.

Mikal Hanson, Asst. U.S. Atty., Pierre, S.D., for appellee.

Before HEANEY, BOWMAN and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

John David Bartlett appeals from a judgment of the district court entered in accordance with a jury verdict finding him guilty of assault with intent to commit rape in violation of 18 U.S.C. § 113(a). We affirm.

### I.

On March 14, 1979, Bartlett, an enrolled member of the Cheyenne River Sioux Tribe, was arrested and charged under state law with the attempted rape of Henrietta Ruth Janis at the Eagle Butte Legal Services Office on the Cheyenne River Sioux Reservation in South Dakota. On April 24, 1979, Bartlett pled guilty in South Dakota state court and was sentenced to a statutory maximum prison term of ten years. Bartlett immediately began serving his state sentence.

On February 9, 1982, after exhausting his state court remedies, Bartlett filed a petition for a writ of habeas corpus in the federal district court of South Dakota. The petition alleged that the South Dakota state court was without jurisdiction because the federal government had exclusive jurisdiction to try offenses committed by Indians on the Cheyenne River Sioux Reservation pursuant to 18 U.S.C. § 1153. The district court agreed and on April 19, 1982, filed a Memorandum and Order granting the petition. This Court affirmed the decision of the district court, *Bartlett v. Solem*, 691 F.2d 420 (8th Cir.1982) (en banc), and was ultimately affirmed by the United States Supreme Court. *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984).

When counsel for the government learned of the Supreme Court's decision, he immediately contacted state penal authorities to determine if Bartlett still presented a danger to the community. The state authorities expressed their belief that Bartlett continued to pose such a danger. Thus, on March 7, 1984, one week before the statute of limitations would have run, the government obtained an indictment charging Bartlett with assault with intent to commit rape.

On September 25, 1984, Bartlett filed a motion to dismiss for pre-indictment delay. On April 5, 1985, the district court granted the motion and ordered Bartlett released from custody. In so doing, the court found that the government's decision to delay bringing an indictment until Bartlett's habeas action had been definitively decided on appeal was not reasonable in light of its consistent assertion of jurisdiction over crimes on the reservation. *United States v. Bartlett*, No. Cr. 84–30018 (D.S.Dak. 1985). In addition, the district court found that Bartlett's continued incarceration and the death or disappearance of several witnesses who might have provided exculpatory evidence actually prejudiced his ability to present a defense. *Id.*[1]

---

**1.** Prior to granting the motion to dismiss for pre-indictment delay, the district court granted a motion for a psychiatric examination. Following the examination a report was submitted to the court stating that Bartlett suffered from a schizophrenic disorder "which seems pretty well compensated at the present time." The report continued:

> There is no clear evidence of acute psychosis but with his history and flat affect, and the presence of looseness of association, my diagnosis of schizophrenia, residual, chronic, seems to be appropriate. He is not acutely delusional at this point and he is not having any hallucinations; thus, his treatment is being effective. He seems to have a good understanding of his present situation and seems to understand the legal aspects of his problems and I consider that he is competent to stand

trial and assist his attorney in his own defense. At this point he is able to differentiate right from wrong and he reported that to rape a person is a bad action. Nevertheless, he minimized the importance of his actions by saying that he never raped anybody. I wouldn't be able to make an assessment at this point as to whether or not he was insane or unable to understand right from wrong at the time of the crime as this occurred too many years ago. I'm not sure that the description of the event has been rehearsed by the patient after multiple reports to different interviewers. It seems that at the time of the crime, John was on medication and by the description of events, he stated that he was on his way to get a refill on his meds when he felt the urge to commit the crime. He was also under a lot of stress, as apparently he was going through a divorce but it is not clear

On appeal, this Court reversed and remanded for a new trial finding that Bartlett had failed to demonstrate sufficient actual prejudice to warrant dismissal.[2] *United States v. Bartlett,* 794 F.2d 1285, 1290–93 (8th Cir.), *cert. denied,* 479 U.S. 934, 107 S.Ct. 409, 93 L.Ed.2d 361 (1986). In so doing we stated:

> The case before us is presented on a limited record developed at a pre-trial hearing. Conceivably, when the issues are fully tried, there may be additional evidence presented that Bartlett sustained actual and substantial prejudice as a result of the loss of the witnesses. The district court is free to reevaluate whether the delay has caused Bartlett such prejudice as to impair the fairness of the trial.

*Id.* at 1294 (citation omitted).

Following the remand, Bartlett renewed a previous motion for a psychiatric examination. On September 4, 1986, the district court entered an order granting the motion. Upon examination, Bartlett was found competent to stand trial. On January 12, 1987, the jury trial began and, on January 14, 1987, the jury returned a verdict of guilty. On February 18, 1987, the trial court sentenced Bartlett to the maximum penalty permitted by statute and ordered a study and observation pursuant to 18 U.S.C. § 4205(c) and (d). On June 12, 1987, following completion of the study, the court sentenced Bartlett to eighteen years imprisonment.

## II.

On appeal, Bartlett raises seven issues: (1) whether his prosecution and punishment violates the Fifth Amendment prohibition of double jeopardy, (2) whether the district court erred in refusing to instruct the jury on the issue of "diminished capacity," (3) whether the district court erred in admitting a confession, (4) whether the district court erred in admitting testimony of a psychologist concerning statements made by Bartlett during a prior evaluation, (5) whether the district court erred in refusing to admit alleged prior false accusations of rape made by the victim, (6) whether the indictment should have been dismissed for pre-indictment delay, and (7) whether the district court had jurisdiction.[3] We address these issues in turn.

### A. Double Jeopardy

Bartlett's case raises two distinct double jeopardy issues: first, whether the subsequent federal prosecution was proper, and second, whether it subjected him to multiple punishment for the same offense.

### 1. Propriety of the Subsequent Prosecution

It is well settled that a state prosecution is no bar to a subsequent federal prosecution absent a showing that one sovereign was acting as "merely a tool" of the other in order to avoid the prohibition against double jeopardy. *See e.g., Abbate v. United States,* 359 U.S. 187, 194–95, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959) (reviewing cases); *Bartkus v. Illinois,* 359 U.S. 121, 123–24, 79 S.Ct. 676, 678, 3 L.Ed.2d 684 (1959); *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922). Bartlett does not claim that the federal prosecutor was acting as a tool of South Dakota in pursuing the subsequent prosecution. Nonetheless, he urges the Court to exercise its "supervisory power"

what his mental condition was at the time of the crime.

**2.** Because the Court found that Bartlett had not made an adequate showing of actual prejudice, it did not pass upon the district court's finding that the government's delay was "an intentional device to gain a tactical advantage over the accused." The Court did, however, comment that it had "difficulty finding in the government's decision to delay indicting Bartlett an appropriate governmental interest." *United*

*States v. Bartlett,* 794 F.2d 1285, 1294 (8th Cir. 1986).

**3.** Concerning the question whether the district court had jurisdiction, Bartlett now argues that the Supreme Court erred in finding exclusive jurisdiction in the federal government to try crimes occurring on the Cheyenne River Sioux Reservation. In light of the Supreme Court's clear holding to the contrary, *see Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), the argument is meritless.

and to dismiss the indictment because the federal prosecutor acted in bad faith and in a discriminatory manner in prosecuting him.

Specifically, Bartlett argues that his prosecution was brought in contravention of the Justice Department's Petite policy. As this Court has written, the Petite policy:

> [W]as first expressed by Attorney General William P. Rogers in a news release dated April 6, 1959. In that news release, the Attorney General stated that the power of the federal government to prosecute a defendant who had previously been prosecuted in a state court for the same act or acts should be sparingly used. Specifically, he expressed the view that such prosecutions should not occur "unless the reasons are compelling." He doubted "that it is wise or practical to attempt to formulate detailed rules to deal with the complex situation which might develop, particularly because a series of related acts are often involved." However, he expressed the view that prior to trial of a federal case following a state prosecution, a recommendation should be submitted by the United States Attorney to the appropriate Assistant Attorney General, and no such recommendation should be approved without its having first been brought to the attention of the Attorney General.

*Delay v. United States*, 602 F.2d 173, 176 (8th Cir.1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980) (footnotes omitted).

The United States Supreme Court in granting the Solicitor General's request to dismiss an indictment brought in contravention of the Petite policy noted:

> The policy * * * limits the federal prosecutor in the exercise of his discretion to initiate or to withhold, prosecution for federal crimes. The policy is useful to the efficient management of limited Executive resources and encourages local responsibility in law enforcement. But it also serves the more important purpose of protecting the citizen from any unfairness that is associated with successive prosecutions based on the same conduct.

In this respect, the policy represents the Government's response to repeated expressions of concern by Members of this Court. In *United States v. Lanza*, 260 U.S. 377, 383, 67 L.Ed. 314, 43 S.Ct. 141 [143] (1922), for example, Mr. Chief Justice Taft quoted the following passage from *Fox v. Ohio*, [46 U.S.] 5 How 410, 435, 12 L.Ed. 213 (1847):

> "It is almost certain, that, in the benignant spirit in which the institutions both of the state and federal systems are administered, an offender who should have suffered the penalties denounced by the one would not be subjected a second time to punishment by the other for acts essentially the same, unless indeed this might occur in instances of peculiar enormity, or where public safety demanded extraordinary rigor."

*Rinaldi v. United States*, 434 U.S. 22, 27–28, 98 S.Ct. 81, 84, 54 L.Ed.2d 207 (1977) (per curiam).

■ The government contends that the Petite policy does not apply to Bartlett's case because the state prosecution was set aside on jurisdictional grounds and not on the merits. We need not, however, determine the applicability of the policy to Bartlett's case. Despite the worthy goals the Supreme Court has recognized the policy serves, this Court has found that the Petite policy does not generally confer substantive rights. *See United States v. Moore*, 822 F.2d 35, 36 (8th Cir.1987); *United States v. Staples*, 747 F.2d 489, 491 (8th Cir.1984); *Delay*, 602 F.2d at 178; *but see Delay*, 602 F.2d at 179 (Heaney, J. concurring in the result) (stating, "In my view, when a defendant has properly raised this policy * * * we should follow the lead of the Supreme Court * * * and hold that the policy against multiple prosecutions serves the important purpose of protecting the citizen from any unfairness that is associated with successive prosecution based on the same conduct."). Thus, the policy cannot form the basis of a claim that the subsequent prosecution was improper.

■ Bartlett also argues that the prosecution was discriminatory and in bad faith because it was brought only after he suc-

cessfully challenged his state conviction. In this regard, Bartlett argues that if he had not exercised his right to challenge the conviction, he would by now have served his state sentence and would no longer be in custody. Yet, as this Court has stated:

> [t]he presumption is always that a prosecution for violation of a criminal law is undertaken in good faith and in nondiscriminatory fashion * * *.
>
> In order to overcome this presumption the defendant bears the burden of proving that he was singled out for prosecution while others similarly situated were not indicted, and that the decision to prosecute him was in bad faith and based upon impermissible consideration.

*United States v. Crow Dog*, 532 F.2d 1182, 1196 (8th Cir.1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977).

We cannot say that Bartlett has met his burden of showing that the prosecution was based upon impermissible considerations. First, the State of South Dakota, and not the federal government, petitioned the Supreme Court to review the jurisdictional question at issue in Bartlett's case. In point of fact, the federal government maintained a position consistent with that urged by Bartlett throughout the appeal. *See United States v. Bartlett*, 794 F.2d 1285, 1293 n. 12 (8th Cir.1986) ("The district court found that the United States had consistently asserted it had criminal jurisdiction on the Cheyenne River Sioux Reser-

vation throughout the 1970's * * *. It further found that the files of the court reflect numerous criminal indictments for acts on the reservation during the entire pendency of the Bartlett habeas corpus appeal.").

The government candidly admits that the primary consideration in its determination to prosecute was the view of state penal authorities that Bartlett continued to present a substantial danger to the community. Brief of Appellee at 12–13. While the presentence investigation report and the psychiatric evaluation contained therein indicate that the reason Bartlett presents a danger to the community is his troubled mental state, and while this Court cannot condone the use of a criminal proceeding to incapacitate one who is dangerous by reason of mental illness, we cannot say that Bartlett has made a sufficient showing that the decision to prosecute him was based on impermissible considerations. Thus, we find that the subsequent federal prosecution was proper.

### 2. Multiple Punishment

■ The second double jeopardy concern is whether the subsequent federal prosecution subjected Bartlett to multiple punishment for the same conduct. At oral argument before this Court, the government conceded that Bartlett should be given full credit for the time he served in prison as a result of the invalid state conviction.[4]

---

4. At oral argument the government stated:

> The Court: My understanding from the government is that [Bartlett] will be given full credit for his state sentence. * * *
>
> * * * * * *
>
> Government: That's correct.
>
> * * * * * *

When I called the people in Fargo with the Bureau of Prisons I was able to determine that they had not credited him. They had given him 929 days that started in 1984. So then I started calling Washington. I finally got ahold of what was called a sentence computation expert, and he advised me that the policy was that if it was the exact same crime, he should get credit for it. And I advised him that in this particular case it is the exact same crime and the Bureau of Prisons should give credit for Mr. Bartlett. He said that since they hadn't given him credit it couldn't be the exact same crime. But, as late as yesterday, I

talked with them and they did assure me and Ed Haines, with the Bureau of Prisons assured me that he would get credit for all of the state time. And that they would be sending me the computation sheet and I would be happy to write a letter to the court and provide them with that also.

The government has since filed with the Court a sentence computation prepared by the Bureau of Prisons. The computation reflects that Bartlett has been given credit for time served in state prison from March 20, 1979, to his release by order of the district court on April 7, 1985. In addition, the presentence investigation report indicates that in June of 1986, Bartlett was admitted to the mental health unit of the South Dakota Human Services Center because his condition had deteriorated and he was not taking his medication. While at the center, Bartlett allegedly attempted to rape a staff member. The state then filed a criminal complaint concerning the matter but did not pursue the mat-

Thus, the conviction will result in only one punishment and does not violate the prohibition against double jeopardy.

## B. Diminished Capacity

Bartlett argues that the district court erred in refusing to instruct the jury on the issue of diminished capacity. At the outset, it is important to note that Bartlett does not contend he was incompetent to stand trial or legally insane at the time of the crime.[5] In addition, Bartlett did not seek to introduce at trial psychiatric evidence in mitigation of culpability or punishment. Rather, he offered evidence of his mental condition solely for the purpose of showing that, at the time of the incident, his mental condition was such that he lacked the capacity to form the specific intent required to commit the crime with which he was charged.[6]

■ The trial court allowed Bartlett, out of the presence of the jury, to make an offer of proof as to the evidence he intended to offer negating his capacity to form the requisite specific intent. After considering the offer, the court allowed Bartlett to introduce the evidence, subject to the restrictions of Rule 704(b) of the Federal Rules of Evidence.[7] Thereafter, in the presence of the jury, Bartlett presented the testimony of three witnesses on the issue of "diminished capacity."

---

ter further when it learned that this Court had reversed the district court's dismissal of the federal indictment. On September 5, 1986, Bartlett was discharged from the state mental health unit to federal custody. He has remained in federal custody since that time.

5. This Court has addressed the distinction between competence and sanity.

Whether a person charged with a crime is mentally competent to stand trial is a discrete question, governed by different *medical and legal* standards from the question of mental responsibility. To be competent to stand trial a defendant must have, at the time of his trial, "sufficient present ability to consult with his lawyer with a reasonable degree of understanding—and ... a rational as well as factual understanding of the proceedings against him." A claim that the defendant was not criminally responsible, on the other hand, is unconcerned with the defendant's understanding of his situation at the time of trial, but is directed entirely to his capacity to understand and to control his conduct at the time of the commission of the offense.

*Hinkle v. Scurr,* 677 F.2d 667, 669 (8th Cir.), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 609 (1982) (quoting *United States v. Taylor,* 437 F.2d 371, 375 (4th Cir.1971)).

6. It is important to distinguish psychiatric evidence offered in mitigation of general culpability from psychiatric evidence offered to show absence of a specific mental state which is an element of the crime charged. As a district court has stated:

In fact, "diminished responsibility" * * * has generally referred to a defense based on a showing that the accused suffered from an abnormality of mind that "substantially impaired his mental responsibility." *See* Cooper, *Diminished Responsibility—"Borderline Insanity" Direction,* 49 J.Crim.L. 118 (1985). "Diminished capacity," as opposed to "dimin-

ished responsibility," is the term most often used by American courts in referring to defenses aimed at negating specific intent, although this term has also been used in referring to a defense offering evidence of mental disease or defect to show mitigating circumstances.

*United States v. Frisbee,* 623 F.Supp. 1217, 1221 n. 2 (N.D.Cal.1985); *see also* Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage,* 77 Colum.L.Rev. 827 (1976).

This opinion shall refer to "diminished responsibility" as mitigating culpability and to "diminished capacity" as negating the specific intent required for the crime charged.

7. Rule 704(b), enacted as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473 § 406, *reprinted in* 1984 U.S.Code Cong. & Admin.News (98 Stat.) 2067–68, provides:

No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

The trial court found that although the relevant conduct occurred prior to enactment of the rule, its application did not violate the constitutional prohibition against ex post facto laws because it represented a procedural, as opposed to a substantive change in the applicable law. *See United States v. Prickett,* 790 F.2d 35, 37 (6th Cir.1986) (concluding that the change in Rule 704(b) was procedural and its application was not an ex post facto violation); *United States v. Mest,* 789 F.2d 1069, 1072–73 (4th Cir.), *cert. denied,* 479 U.S. 846, 107 S.Ct. 163, 93 L.Ed.2d 102 (1986) (same). We agree and affirm the district court in this respect.

The first witness was Raylene Briggs. In 1978 and 1979, Briggs was employed as a prosecutor for the Cheyenne River Sioux Tribe. In that capacity she met Bartlett, who was employed as a jailor in the county jail. She testified that in the fall of 1978, she went to the jail and discovered Bartlett had released all of the prisoners.[8] She also testified that Bartlett was fired after about a month on the job because, "[h]e did lots of strange things." Trial Transcript at 179–80.

The second witness was George Bartlett, Bartlett's uncle whom Bartlett had lived with for approximately three weeks in the fall of 1978. George Bartlett testified that at the beginning of the three week period, Bartlett was taking his medication and was "normal." He also testified, however, that toward the end of the three week period, Bartlett became unresponsive and would "just up and walk away from you while you was talking to him" and "wouldn't respond in a correct manner." Trial Transcript at 182.

The third witness was Dr. Donald R. Gannon, a psychologist at the South Dakota State Human Services Center. Dr. Gannon testified that he evaluated Bartlett in April of 1979 and again in 1982. He testified that during the evaluation he had seen Bartlett "at various stages of organization or disorganization * * * and * * * would attest that there [are] significant differences between these two conditions." Trial Transcript at 189. In addition, he testified that Bartlett "demonstrate[s] at times some significant distortions in the way he perceives what many of us recognize as reality." *Id.* at 190. Finally, on redirect examination Dr. Gannon testified that he diagnosed Bartlett as "schizophrenic," a term he used to describe one whose "ties with reality are either tenuous or virtually destroyed." *Id.* at 195.

After all evidence had been presented and the lawyers had made their closing arguments, the court instructed the jury on the elements of the crime with which Bartlett was charged including, in particular, specific intent.[9] Bartlett objected to the

8. Briggs stated:

I particularly remember the incident because we had a mental patient back there that was in a real bad state of mind. He talked backward and he was extremely strong and he had to be restrained and we had to actually give him his shot through the jail, through the bars. His brother had been into my office and we had discussed the case. He was going to be transferred to Yankton. His brother left. A few minutes later they came rushing back in the jail and said he was walking down the street. I said he was locked up in the back. They said no. He was walking down the street. I began to argue with him. I said he can't be, I will go check. I did go to the back of the jail and check and the prisoner was gone. As a matter of fact, all of the prisoners had been released.

Q. Who released them?

A. John Bartlett, our jailor. He admitted that he let everybody out.

Q. This was the same day he let them out he was just standing up there at the jail?

A. Yes. He did things like that. That's why he was only employed for us about a month. He did lots of strange things.

Trial Transcript at 179–80.

9. The court instructed the jury as follows:

The offense charged in the indictment requires proof of specific intent before the Defendant can be convicted. Specific intent as

the term implies, means more than the general intent to commit the act. To establish specific intent the Government must prove that the Defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

Intent ordinarily may not be proved directly because there is no way of knowing the operations of the human mind. But you may infer the Defendant's intent from the surrounding circumstances. You may consider any statement made and any act done or omitted by the Defendant, and all other facts and circumstances in evidence which indicate the Defendant's state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequence of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide what facts to find from the evidence.

When the word "knowingly" is used in these instructions, it means that the Defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake or accident. Knowledge may be proved by the Defendant's conduct and by all the facts and circumstances surrounding the case.

An act is done "wilfully" if done voluntarily and intentionally and with the specific intent

specific intent instruction and offered instructions explicitly directing the jury to consider whether, as a result of a mental disorder, he was unable to form the required specific intent.[10] The court overruled the objection and refused the instructions stating:

I concluded that I would not submit as such the diminished capacity defense but only admitted the medical or psychological evidence that I did on the basis that you were offering it on the issue of his ability as to whether or not he did entertain the specific intent required at the time of the alleged incident.

Trial Transcript at 169.

■ The government takes the position that the court did not err in refusing Bartlett's proffered instructions because section 402(a) of Insanity Defense Reform Act of 1984, Pub.L. No. 98–473 § 402(a), *reprinted in* 1984 U.S.Code & Admin. News (98 Stat.) 2057 (currently codified at 18 U.S.C. § 17(a)), renders inadmissible all psychiatric testimony not offered in connection with the affirmative defense of insanity. The section states:

It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or

defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

Although the last sentence of the section would seem to support the government's position, the section's legislative history and statutory scheme reveal that it was not intended to bar evidence tending to show that the defendant was incapable of forming the requisite intent to commit the crime charged.

### 1. The Legislative History

The legislative history of the section is clear that the last sentence is intended to apply only if the defendant seeks to raise mental disease or defect *as an affirmative defense.* Therefore, the sentence would apply only if the defendant seeks to introduce evidence of a mental disease or defect to excuse or to justify what would otherwise be a criminal act. This is in clear contrast to introduction of such evidence to negate the presence of an element of the offense such as specific intent.

Explaining the last sentence of 18 U.S.C. § 17(a), the relevant Senate Report states:

This is intended to insure that the insanity defense is not improperly resurrected in the guise of showing some other *affirmative defense* such as that the de-

to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.

"Unlawfully" means contrary to law. So, to do an act unlawfully means to do wilfully something which is contrary to law.

The term "intent to rape" in this case means that the Defendant specifically intended to have sexual intercourse with Henrietta Ruth Janis, to do this by the use of force and without her consent, and at a time when the Defendant and Henrietta Ruth Janis were not married.

Trial Transcript at 257–59.

**10.** Bartlett offered the following instructions:

Instruction 2A

There has been testimony offered to show that Mr. Bartlett could not, or in fact did not, entertain the specific intent to rape Ms. Janis at the time of the alleged offense. The burden is on the government to show beyond a reasonable doubt that Mr. Bartlett did form the specific intent needed, and if the government fails to sustain that burden, then you

may not convict him of assault with intent to commit rape, but rather must proceed to the lesser offenses of assault by striking, beating or wounding or simple assault.

Thus, you should appropriately consider testimony offered relating to mental disorders or problems which Mr. Bartlett was suffering at the time of the alleged offense herein, which are relevant as to whether he was suffering from a diminished mental capacity herein.

Instruction 7A

When a defendant is charged with a crime which requires that a certain specific intent be established in order to constitute the crime or degree of crime, you must take all evidence into consideration and determine therefrom if at the time when the crime was allegedly committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged.

*See* Designated Record at 39–40.

fendant had a "diminished responsibility" or some similarly asserted state of mind which would open the door, once again, to needlessly confusing psychiatric testimony.

S.Rep. No. 225, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3411 (emphasis added).

Further support for the distinction between evidence of an affirmative defense is found elsewhere in the same report. The report makes clear that the act disallows evidence of voluntary intoxication as an affirmative defense or excuse to a crime but allows it to negate the element of specific intent. The report states, "Of course, intoxication may negate a state of mind required for the commission of the offense charged." *Id.* at 3411 n. 30. Thus, the Senate Report distinguishes evidence of "diminished responsibility," offered as an affirmative defense, from the negation of specific intent by reason of voluntary intoxication which is not an affirmative defense.

The distinction is especially important because it defies logic to assume Congress intended to recognize the distinction between affirmative and non-affirmative defenses in the area of voluntary intoxication but did not intend to draw such a distinction if, through no fault of his own, the defendant suffers from a mental disease or defect.[11]

Finally, a House report accompanying a bill containing a provision very similar to section 17(a),[12] clearly indicates the purpose and intended effect of 18 U.S.C. § 17(a). It states:

Since the current insanity defense is derived from case law, the Committee is concerned that additional affirmative defenses based on mental disorders could be developed by the courts in order to circumvent the tighter requirements developed by Congress. Thus, the bill provides that the Committee's test constitutes the only affirmative defense based on mental disorder that will be applicable in Federal courts. *Mental disorders will remain relevent, of course, to the issue of the existence of a mental state required for the offense, such as the specific intent required for certain crimes.* This accords with current practice.

H.R.Rep. No. 98–577, 98th Cong., 1st Sess., 14–15 (emphasis added, footnote omitted).[13]

In sum, the legislative history of 18 U.S.C. § 17(a) clearly indicates that its last

---

**11.** As the Circuit Court for the District of Columbia has stated in recognizing a non-affirmative defense based on insufficient mental capacity to form the requisite intent:

Neither logic nor justice can tolerate a jurisprudence that defines the elements of an offense as requiring a mental state such that one defendant can properly argue that his voluntary drunkenness removed his capacity to form the specific intent but another defendant is inhibited from a submission of his contention that an abnormal mental condition, for which he was in no way responsible, negated his capacity to form a particular specific intent, even though the condition did not exonerate him from all criminal responsibility.

*United States v. Brawner,* 471 F.2d 969, 999 (D.C.Cir.1972) (en banc).

**12.** The report accompanied a bill stating:

(a) It is a defense to a prosecution for an offense against the United States that, at the time of the conduct alleged to constitute the offense, the defendant suffered from a severely abnormal mental condition that grossly and demonstrably impaired the defendant's perception and understanding of reality and, as a result of that impairment, the defendant

did not appreciate the wrongfulness of the conduct.

(b) A defendant has the burden of proving the existence of a defense under this section by the preponderance of the evidence.

(c) As used in this section, the term "abnormal mental condition" does not include intoxication due to the knowing and voluntary ingestion of alcohol or any other psychoactive substance.

(d) Except as provided in subsection (a) of this section, an abnormal mental condition does not constitute an affirmative defense to an offense against the United States.

(e) If the defense provided by this section is raised as provided by law the trier of fact shall find (or be instructed to find) the defendant not responsible only by reason of insanity, if the defendant would be guilty but for the defense provided by this section.

**13.** Indeed, we find the government's argument inconsistent with the position apparently advanced by the Justice Department in hearings on the insanity defense before a House subcommittee. A House report commenting on the hearings states:

The Department of Justice, in urging abolition of the insanity defense during the 97th Congress, acknowledged that such an ability to negate knowledge of the nature of conduct is

sentence was intended to bar only *affirmative defenses* and not evidence of mental disorders negating the element of specific intent.

### 2. The Statutory Scheme

The statutory scheme of the Insanity Defense Reform Act also indicates that Congress intended to allow evidence of mental disease or disorder negating a specific intent. First, evidence negating specific intent is consistent with Federal Rule of Criminal Procedure 12.2.[14] As the court in *United States v. Frisbee*, 623 F.Supp. 1217 (N.D.Cal.1985), has stated:

> Paragraph (a) of rule 12.2 requires a defendant to give notice prior to trial of his or her intent to make an insanity defense, and paragraph (b) requires pretrial notice of a defendant's intent to offer "expert testimony relating to a mental condition bearing on the issue of his guilt. . . ." If the government's interpretation of [section 17(a)] is correct, it would seem that rule 12.2(b) is quite unnecessary. Nevertheless, Congress has not repealed the rule despite the fact that it has made other modifications to the rule since the enactment of [section 17(a)]. Although this omission is not overwhelming evidence of congressional intent, it does seem inconsistent with the government's argument in this case.

*Id.* at 1223.

Thus, if rule 12.2(b) is to have any continuing effect, psychiatric evidence negating specific intent must be admissible.

Second, Federal Rule of Evidence 704(b), enacted as part of the Insanity Defense Reform Act, clearly prohibits an expert witness "testifying with respect to the mental state or condition of a defendant in a criminal case" from stating an opinion or inference as to "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged * * *." Fed.R.Evid. 704(b). The rule concludes that "[s]uch ultimate issues are for the trier of fact alone." *Id.* Yet, the rule's prohibition of "ultimate issue" psychiatric testimony on the question of the defendant's capacity to form the requisite intent is unnecessary if 18 U.S.C. § 17(a), is interpreted as prohibiting a defendant from even raising the contention that, at the time of the act, a mental condition rendered him or her incapable of forming the requisite intent. Indeed, if section 17(a) is so interpreted all such psychiatric evidence would be inadmissible, not just testimony concerning the "ultimate issue." In light of the fact that rule 704(b) was enacted as part of the same act containing section 17(a), we should not interpret the two provisions so as to render either superfluous.

In sum, we reject the government's position that all psychiatric evidence not offered in connection with the affirmative defense of insanity is inadmissible. The Insanity Defense Reform Act, as clarified by its legislative history and statutory scheme, clearly allows Bartlett to raise the

---

constitutionally mandated by the principle that all elements must be proved beyond a reasonable doubt. *Hrgs.* 97th Cong. at 40 (statement of Associate Attorney General Rudolph Giuliani).
H.R.Rep. 577, 98th Cong., 1st Sess., 15 n. 23.

**14.** Federal Rule of Criminal Procedure 12.2(a) and (b) states:

(a) If a defendant intends to rely upon the defense of insanity at the time of the alleged offense, the defendant shall, within the time provided for the filing of pretrial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this

subdivision, insanity may not be raised as a defense. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

(b) If a defendant intends to introduce expert testimony relating to a mental disease or defect or any other mental condition of the defendant bearing upon the issue of guilt, the defendant shall, within the time provided for the filing of pre-trial motions or at such later time as the court may direct, notify the attorney for the government in writing of such intention and file a copy of such notice with the clerk. The court may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate.

issue whether a mental disease or defect at the time of the alleged crime rendered him incapable of forming the requisite intent.

This, however, does not end the matter. Although the district court indicated it would not recognize a defense based on "diminished capacity," it did allow Bartlett to present psychiatric evidence negating his capacity to form specific intent. Thus, having determined that the district court properly admitted the evidence, we must now consider whether the district court erred in giving a generic specific intent instruction rather than an instruction which clearly set forth Bartlett's contention that his mental condition rendered him incapable of forming the specific intent to commit the crime.

In reviewing the adequacy of jury instructions in criminal cases, this Court has long held that "a defendant is entitled to an instruction on his theory of the case if there is evidence to support it and a proper request has been entered." *United States v. Brown*, 540 F.2d 364, 380 (8th Cir.1976); *see also United States v. Montgomery*, 819 F.2d 847, 851–52 (8th Cir.1987); *United States v. Richmond*, 700 F.2d 1183, 1195–96 (8th Cir.1983); *United States v. Brake*, 596 F.2d 337, 339 (8th Cir.1979). Yet, this

Court has also held that a defendant is not entitled to a particularly worded instruction and the district court has considerable discretion in framing the instructions. *Richmond*, 700 F.2d at 1196. Moreover, the instructions are sufficient if, taken as a whole, they adequately and correctly cover the substance of the requested instruction. *Brake*, 596 F.2d at 339.

■ Applying the standard to the instructions given by the district court, we cannot say they were fatally flawed. Although a more detailed instruction drawing attention to the issue of whether Bartlett's mental condition rendered him incapable of forming the requisite mental state would have been preferable, we cannot say that the instructions, taken as a whole, failed to adequately and correctly apprise the jury of Bartlett's theory of the case.

Despite the somewhat confusing rationale given by the district court for denying the proposed instructions, it is clear that Bartlett's counsel understood the court's statement as affording him the opportunity to raise lack of capacity to form the requisite specific intent in his closing argument. Moreover, the record reveals that Bartlett's counsel took full advantage of that opportunity.[15]

---

**15.** Indeed, lack of capacity is a focal point of Bartlett's closing argument. Examples from the record include:

[1] We're not saying he's not responsible because he's insane. * * * [T]he issue that's presented to you folks, and that's one that I ask you to consider very seriously, is did John Bartlett have the specific intent to rape Henrietta Ruth Janis. [Trial Transcript at 231.]
[2] You've got to look at what kind of intent do people form in their mind. * * * If you're doing something of the nature planned and you're doing it intentionally, intending specifically the wrongs charged against you, you're going to be aware enough, I suggest, to do some of the things that Mr. Bartlett didn't do. [Trial Transcript at 232.]
[3] Does that show specific intent or does that show a mind that particular day that is wandering, that is in a position that it may well not have, or that he may well not have intended the result of his action. [Trial Transcript at 233.]
[4] I mean, is that a sensible, is that a person acting with specific intent with a mind able to intend the consequence of assaulting Ruth Janis with intent to rape her.

[5] Now Mr. Bartlett, the same Mr. Bartlett that maybe had as suggested by the Government the intent to rape Henrietta Ruth Janis, by his own testimony after he left there called the Tribal Police and said, I don't remember exactly what his words were, but to the effect that there was something that happened down at the Legal Aid Office. Is this the mind of a person who has the ability that particular day to form the intent, the specific intent * * *. [Trial Transcript at 236.]
[6] We put the burden on the Government to show beyond a reasonable doubt each and every element of the charge of the crime charged. One of those elements that the burden is on the Government to show is that Mr. Bartlett had that specific intent to rape Ruth Janis on March 14th, 1979. [Trial Transcript at 237.]
[7] [I] state to you again this isn't some plan that we're coming in today saying John Bartlett is not responsible for anything that happened that day. He's insane. He can walk away. What we're saying is that the Government has to show beyond a reasonable doubt that he specifically intended to assault her with the intent to rape her. [Trial Transcript at 238.]

While "arguments of counsel cannot substitute for instructions by the court," *Taylor v. Kentucky,* 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936, 56 L.Ed.2d 468 (1978), this is not a case in which the trial court failed to instruct on a defense theory. Rather, it is one in which the court refused to instruct with the specificity or in the language defense counsel desired. In such a situation, it is appropriate to assess the instructions given by the court in the context of the entire record to determine whether the failure to give the more specific instruction was harmless beyond a reasonable doubt.[16] *Cf. Richmond,* 700 F.2d at 1196 (assessing prejudice to the defendant from trial court's failure to give specific "theory of defense" instruction); *Brown,* 540 F.2d at 381 (same). In the instant case, we find that the failure of the district court to give a separate and specific instruction on the issue whether Bartlett's mental condition rendered him incapable of forming the requisite specific intent was harmless beyond a reasonable doubt.

C. Admission of the Confession

Bartlett contends that the trial court erred in admitting a confession he gave to the police. Prior to the originally scheduled federal trial, Bartlett brought a motion to suppress the confession, contending that his mental condition at the time he gave it rendered it involuntary. On October 2, 1984, the district court held a hearing at which the government presented testimony concerning the confession.

The testimony related that several hours after the incident, in response to a police request, Bartlett went to the office of Bureau of Indian Affairs Special Officer Louis White. There he found White and Ted Schweitzer, the Sheriff of Dewey County, South Dakota. On his arrival, the officers read to Bartlett from a form advising him of his *Miranda* rights. The officers then inquired whether Bartlett understood the rights and whether he wished to waive them. Bartlett answered both inquiries affirmatively. Thereafter, the officers requested Bartlett to sign the form indicating that he was knowingly and voluntarily waiving his rights. Both officers signed the form as witnesses. Both officers testified that, after waiving his rights, Bartlett gave an oral statement in which he admitted to striking Janis, carrying her to a back room, undressing her, and attempting to rape her. Transcript of October 2, 1984, Hearing at 29–30, 40–41. Both officers testified that the meeting lasted no more than a half hour and that Bartlett appeared normal throughout the meeting.

After hearing the testimony, the trial court reserved ruling on the voluntariness of the confession and sua sponte ordered Bartlett to submit to an examination at the United States Hospital in Springfield, Mis-

[8] Dr. Gannon did give an opinion that John Bartlett loses touch with reality from time to time and that he is psychotic. And I believe when you look at all the facts you can look at that and I suggest you can look at that testimony as far as whether did Mr. Bartlett have the specific intent on this day in question. [Trial Transcript at 239.]
[9] Mr. Bartlett got on the stand and testified. You witnessed his demeanor throughout the trial. You've witnessed his demeanor from the witness stand. You can consider all of that, and I think you can consider it when you're determining the question of is Mr. Bartlett in the position to specifically intend the consequences or specifically intend to do what the Government charges in this case. [Trial Transcript at 241.]
[10] So it gets back to the question of specific intent to rape. I would suggest to you that this case revolves around that question, re-

volves around the question of Mr. Bartlett on March 14, 1979, the same John Bartlett who according to the statement was going to the hospital for medicine that day. [Trial Transcript at 243.]
[11] But the question that is ultimately presented to you is does the Government prove to you beyond a reasonable doubt as the Court will instruct you, that Mr. Bartlett assaulted Henriette Ruth Janis with the specific intent to rape her. Did his mind form the specific intent to rape her that day. [Trial Transcript at 244.]

16. As this Court stated in *Brake:*
It is clear to us that the jury understood the defense theory and that under the instructions of the court defense counsel could, and doubtless did make an adequate argument on the basis of that theory.
596 F.2d at 339.

souri.[17]

At trial, Bartlett again renewed his motion to suppress the confession. Initially, the district court refused to rule on the motion, erroneously believing that the motion had been denied at the October 2 hearing. After a recess during which the court examined a transcript of the October 2 hearing, the court, however, acknowledged it had not ruled on the motion. The court then entered a ruling, carefully analyzing the record made at the October 2, 1984, hearing as it related to the finding of voluntariness required by 18 U.S.C. § 3501. The court found the following facts to have existed at the time the confession was given: (1) Bartlett was not under arrest; (2) Bartlett knew the nature of the offense of which he was suspected; (3) Bartlett was advised of and knew that he was not required to make any statement and that any such statement could be used against him; (4) Bartlett was advised of his right to assistance of counsel, but was without the assistance of counsel when he gave the confession. On the basis of these findings, the district court concluded that the government had established voluntariness by a preponderance of the evidence and denied the motion to suppress. Trial Transcript at 32–34.

Pursuant to 18 U.S.C. § 3501(a), before a confession is received in evidence, the trial judge must, out of the presence of the jury, determine that it was voluntarily made.[18] In making that determination, the trial judge is to consider "all of the circumstances surrounding the giving of the confession" including those factors specifically enumerated in 18 U.S.C. § 3501(b).[19] Pursuant to the section, however, "[t]he presence or absence of any of the * * * factors * * * need not be conclusive on the issue of voluntariness of the confession." 18 U.S.C. § 3501(b).

■ Reviewing a voluntariness determination, this Court will overturn the trial court's factual findings as to the circumstances under which a confession was giv-

---

**17.** The court stated:

[B]efore I would rule on either not guilty by reason of mental illness or voluntariness, perhaps not voluntariness, but I would sua sponte order him examined at the United States Hospital in Springfield. Really, I think it is a situation where it is the type of observation that requires continuing observation. I don't mean to suggest to Mr. Bartlett that he is not mentally well. But on the other hand, at one time or another, there was some reason —I don't know what the commitments were for. Maybe they were for alcoholism. But I really think that the place where we would most likely get a professional opinion would be there.

I want to just let you make, both sides, make your record and then I am not going to rule today.

Transcript of October 2, 1984, hearing at 53–54.

**18.** Pursuant to the last sentence of 18 U.S.C. § 3501(a), if the trial judge determines that the confession was voluntary and admits it, evidence of voluntariness may be presented to the jury and the jury may be instructed to "give such weight to the confession as the jury feels it deserves under all the circumstances." *Cf. Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (holding that the Due Process Clause of Fourteenth Amendment and Compulsory Process or Confrontation Clauses of the Sixth Amendment require a defendant be allowed to present to the jury evidence concerning the voluntariness of a confession despite a judicial finding that the confession was voluntary). We do not understand Bartlett to argue that the trial court erroneously limited presentation to the jury of evidence concerning the voluntariness of the confession. In addition, we note that the trial court specifically instructed the jury that it was for them to decide whether Bartlett made the confession and, if so, how much weight to give to it. The court also instructed the jury that, in making those decisions, it should "consider all of the evidence about the statement, including the circumstances under which the Defendant may have made it." Trial Transcript at 255.

**19.** The enumerated factors are:

(1) the time elapsing between the time of the arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

18 U.S.C. § 3501(b).

en only if they are clearly erroneous. *See, e.g., United States v. Iron Thunder,* 714 F.2d 765, 772 (8th Cir.1983). The legal sufficiency of those findings to show voluntariness is, however, a question of law which we review de novo. *See United States v. Wilson,* 838 F.2d 1081, 1086 (9th Cir.1988) (citing *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)).

The government argues that this case is governed by *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In that case, the defendant approached two police officers, confessed to a murder, and directed them to the location of a past murder. Throughout their contact with the defendant, the officers perceived nothing indicating the defendant was mentally ill. Subsequently, the defendant became disoriented and stated that voices told him to confess or commit suicide. The Colorado Supreme Court held that the defendant's mental condition prevented him from giving a voluntary confession and concluded that the confession could not be admitted consistent with the federal constitutional due process requirements. The United States Supreme Court reversed, holding that government overreaching is a predicate to a violation of due process in the context of the admission of a confession.[20] Thus, although the Court found that mental condition is "surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." 479 U.S. at 165, 107 S.Ct. at 521, 93 L.Ed.2d at 483.

The voluntariness inquiry in this case, however, is based on the dictates of 18 U.S.C. § 3501. In this regard, the second factor to be considered by the trial court in section 3501(b) is whether, at the time the confession was given, the defendant knew the nature of the offense with which he was charged or of which he was suspected. While this may indicate that something more is required under section 3051(b) than is required by the Due Process Clause, we need not decide that issue.

Review of the record reveals that the findings of the district court concerning the enumerated factors are not clearly erroneous. In addition, we note that the statement Bartlett gave to the officers was straightforward, coherent, and entirely consistent with that of other witnesses at the trial. Thus, we hold that the district court did not err in admitting the confession.

### D. Admission of Bartlett's Statements to the Psychologist

Bartlett contends that the district court erred in admitting testimony of a psychologist, Dr. Gannon, concerning statements Bartlett made to him during an examination conducted in connection with the prior state court proceedings. At trial, Bartlett offered Dr. Gannon's testimony in support of his contention that his mental condition at the time of the offense rendered him incapable of forming the requisite intent. On direct examination, Dr. Gannon testified that he examined Bartlett in April of 1979, administering three or four common psychological tests, observing him, and visiting with him face to face. Trial Transcript at 187–89. Based on his examination, Dr. Gannon concluded that Bartlett was "marginally able to assist in his defense" but that at times he "demonstrated some significant distortions in the way he perceives what many of us recognize as reality." Trial Transcript at 189–90.

On cross-examination, the prosecutor sought to question Dr. Gannon concerning statements Bartlett made to him during the 1979 examination. Bartlett's counsel objected on the grounds that the line of inquiry was beyond the scope of direct examination, invaded the doctor-patient privilege, impermissibly offered Bartlett's statements as fact, and went beyond permissible

---

**20.** The Court stated:

Our "involuntary confession" jurisprudence is entirely consistent with the settled law requiring some sort of "state action" to support a claim of violation of the Due Process Clause of the Fourteenth Amendment.
479 U.S. at 165, 107 S.Ct. at 521, 93 L.Ed.2d at 483.

analysis of the statements. Trial Transcript at 193. The court overruled the objection. Thereafter, Dr. Gannon testified that Bartlett, in response to his question as to what happened, stated that he "raped a woman."[21]

Bartlett argues that, had Dr. Gannon examined Bartlett in connection with his federal trial pursuant to 18 U.S.C. § 4241 or § 4242, Rule 12.1(c) of the Federal Rules of Criminal Procedure would have rendered the statements inadmissible.[22] From this, Bartlett contends that the Fifth Amendment privilege against self-incrimination imposes the same requirements if an examination is conducted pursuant to an order of a state court. In addition, Bartlett argues that, even if the requirements of Rule 12.2(c) are not applicable, the question remains whether the statement to Dr. Gannon was voluntary and therefore subject to 18 U.S.C. § 3501 which requires a hearing out of the presence of the jury to determine voluntariness.

The government responds that the Fifth Amendment privilege does not apply for two reasons. First, because Bartlett introduced the testimony of Dr. Gannon in support of his contention that he was incapable of forming the requisite intent, Dr. Gannon was not acting as the agent of the government in relating Bartlett's statements. *Cf. Estelle v. Smith*, 451 U.S. 454, 465–66, 101

S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981) (distinguishing situation in which defendant seeks to introduce psychiatric testimony). Second, Dr. Gannon's statement was not admitted for the purpose of proving guilt but rather for the purpose of determining the basis of Dr. Gannon's opinion. *Cf. Watters v. Hubbard*, 725 F.2d 381, 386 (6th Cir.), *cert. denied*, 469 U.S. 837, 105 S.Ct. 133, 83 L.Ed.2d 74 (1984) (admitting psychiatrists' testimony that defendant had admitted the offenses with which he was charged, "where the evidence was admitted *not for the purpose of showing guilt*, but to cross-examine and test the psychiatrists as to the bases for their expert opinions").

We need not resolve the issues raised by the parties. Instead, we hold that, even if the district court erred in admitting Dr. Gannon's testimony, the error was harmless beyond a reasonable doubt. The confession related by Dr. Gannon was only one of three admitted at trial. The first was the confession Bartlett made to Officer White and Sheriff Schweitzer several hours after the incident. That confession, which we have found was properly admitted, *see* part 3 *supra*, was already in evidence when Dr. Gannon testified. The second confession was that related by Dr. Gannon, which is here at issue. The third, admitted in evidence after the first two, was given

---

21. Dr. Gannon testified as follows:

Q. [T]he interview was a part of your evaluation?
A. Yes.
Q. This is the evaluation that you talked about on direct examination?
 \* \* \* \* \* \*
A. As I understand it I was asked what did I assess. It was part of, yes.
Q. And did he advise you of anything at that time?
A. He answered some of the questions I put to him.
Q. Can you relate that to the jury?
 \* \* \* \* \* \*
A. In response to my question of what happened he said "I raped a woman."
Q. Did he give any indication of why he did that, did he relate that to an event that occurred prior to it?
A. Well, in response to another question possibly related to what you are asking I said in essence "why" and he said "Well, I just got

to looking at her. I just got to looking at her"—I simply can't remember the exact words.
Q. Well, was the fact that his wife was in the process of divorcing him?
A. Yes, he said that.
Q. I guess you can testify what did he say in regard to that, his wife's divorcing him?
A. Oh, I asked why he had used this form for sexual relief and he said "Well, my wife is divorcing me."
Trial Transcript at 192–194.

22. Rule 12.2(c) states in relevant part:
No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based on the fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony.

from the stand by Bartlett himself.[23] Thus, we find that admission of Bartlett's statements to Dr. Gannon was harmless beyond a reasonable doubt. *Cf. United States v. Zink,* 612 F.2d 511, 515–16 (10th Cir.1980) (finding admission of psychiatrist's testimony relating statements made by defendant as to his guilt did not constitute "plain error" because defendant had already testified to the substance of them).

### E. Alleged Prior False Accusation of Rape

 Bartlett contends that the trial court erred in refusing to admit evidence concerning an alleged prior false accusation of rape made by Janis. The accusation first arose in the context of Bartlett's motion for dismissal as a result of pre-indictment delay. In support of that motion, Bartlett alleged that in the intervening period between the incident and the federal indictment, Frank Hawk Eagle had died. Bartlett contended that the loss of Hawk Eagle's testimony was prejudicial because Hawk Eagle would have testified that several months before the incident, he (Hawk Eagle) and a friend were in a parked car with Janis; that Janis had consensual intercourse with the friend; that Hawk Eagle then had intercourse with Janis, and that Janis thereafter falsely accused him of rape.[24]

On remand to the trial court, Bartlett again raised the issue seeking a pre-trial ruling on the admissibility of evidence showing that Janis had falsely accused Hawk Eagle of rape. The court inquired as to the precise nature of the testimony Bartlett would offer. Bartlett responded that he would offer the testimony of Ho-

23. Bartlett's testimony is hardly the product of a sharp and rational mind. For instance, upon taking the stand and before being asked a question by his lawyer, Bartlett stated, "I plead, your Honor, not guilty." Trial Transcript at 197. Subsequently, Bartlett testified concerning the incident at the Eagle Butte Legal Services Office. He stated:

Q. Tell us what happened?
A. When I walked in I knew something was up because she said something in the manner of leave. So I sat down on the couch and she went back to the pop machine and got a grape pop and sat down for a little while and then we headed out for a little while and leave and she went back toward the back office and I approached her a little bit and she was starting towards the back office and I was staring at the clock at the time. She went directly in front of me facing east, northeast, towards the back of the office and I approached her for a little while and I hit her once because I just got tired. And what happened with her pregnancy got to me because I knew she was pregnant at the time. I knew she was pregnant, Mr. Riter.

\* \* \* \* \* \*

Q. \* \* \* Is there anything else about that day, March 14th, 1979 that you want to tell us?
A. Yes. I'd like to clear my conscience now, Your Honor. As to the former plea, Your Honor. I had a guilty conscience then about something, about intercourse, I had intercourse numerous times with my wife in that previous nine months prior to the divorce. She divorced me in the state prison. I'd like to get onto the plea now, Mr. Riter.
Q. So you are finished as far as March 14th, 1979?
A. Yes, Mr. Riter.

Trial Transcript at 206–09.
On cross examination, the following exchange took place:

Q. You testified that you wanted to clear your conscience on direct examination. What do you mean by you wanted to clear your conscience?
A. I felt like raping her at the time, Mikal.
Trial Transcript at 215.

24. We discussed Hawk Eagle's possible testimony in footnote 8 of our prior opinion, stating:

Although the district court did not explicitly find that testimony of the victim's prior false accusation of rape would be admissible under rule 412(b)(1), it is necessarily subsumed in *the court's conclusion that Bartlett was prejudiced by the loss of this testimony.*
*United States v. Bartlett,* 794 F.2d 1285, 1292 n. 8 (1986) (citations omitted).
In pressing this issue before the district court on remand, Bartlett argued that the footnote stands for the proposition that the evidence must be admitted in order to comport with the requirements of the Confrontation Clause of the United States Constitution. *See* Trial Transcript at 18. The footnote, however, merely highlights that we assumed for the purposes of the opinion and without deciding the issue, as did the district court, that Hawk Eagle's testimony would have been admissible. On the basis of that assumption, we held that Bartlett was not prejudiced by the unavailability of the testimony because it is "only of limited probative value when considered against the evidence in the record." *Id.* at 1293. Thus, the footnote offers no support for Bartlett's contention.

mer Billy Cook, with whom Janis had lived. Cook would testify that sometime between 1975 and 1978 Janis had alleged Hawk Eagle raped her and that nothing ever came of the allegation. Bartlett also indicated that Janis would testify that she told her parents of the incident and that her parents told the police but then decided not to press charges because the other individual in the car would not cooperate with any investigation. Trial Transcript at 146. Finally, Bartlett indicated that he would offer the testimony of a private investigator who had searched the relevant law enforcement and court records and determined that Janis never formally lodged a complaint about the matter. Trial Transcript at 22.

The trial court refused to admit the evidence, finding that its probative value and relevance was very small. The court noted that the probative value was directly related to the strength of the evidence tending to show that the charge was in fact false. The court found that it was very doubtful the evidence would convincingly show falsity. In addition, the court found that, even if the evidence of falsity were stronger, the probative value of the evidence would still depend on the inference that, because the victim made a false accusation in the past, the instant accusation is also false. Yet, because the circumstances of the two incidents were so different, the value of the inference to be drawn was minimal.[25]

Bartlett contends that the court erred in refusing to admit the evidence. Specifically, he contends that, although Federal Rule of Evidence 412 generally bars evidence of a victim's past sexual behavior, it contains an exception allowing admission of evidence that "is constitutionally required to be admitted." Fed.R.Evid. 412(b)(1). He presumably relies on the Sixth Amendment right of confrontation as imposing a consti-

tutional right to impeach the victim with her alleged prior false allegations.

Initially, we note that there is a question whether Rule 412 reaches the use of a prior false accusation of rape for impeachment purposes. It has been suggested that prior false accusations are not the "evidence of a victim's past sexual behavior," intended to be covered under Rule 412, *see* 23 Wright and Graham, *Federal Practice and Procedure* § 5384 p. 546–47 (West 1980) (citing Hearing on H.R. 1466 and other bills before the Criminal Justice Subcommittee of the House Judiciary Committee, 94th Cong., 2d Sess., 1976, p. 83), but are more properly analyzed under Rule 608(b).[26] We need not, however, address the issue because under either rule the inquiry is the same.

Under either rule, "[t]he Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). This right "includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias or self-interest in testifying." *Hughes v. Raines*, 641 F.2d 790, 792 (9th Cir.1981) (citing *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110). Admission of all evidence that is the least bit probative of credibility is not, however, always constitutionally required. For example, prior to the enactment of Federal Rule of Evidence 412, this Court found evidence concerning the victim's past sexual conduct offered for impeachment purposes inadmissible due to its minimal probative value and its highly prejudicial effect. Despite acknowledging that the evidence may have been logically relevant, we found that its exclusion did not deprive the defendant of a constitutional right. *Unit-*

---

**25.** The court noted that in the incident involving Bartlett, Janis was in a place of business in mid-morning carrying out her business, was struck in the head, and was found naked with the doors locked, all factors indicating a lack of consent and a completely different situation than that indicated in the prior incident.

**26.** Rule 608(b) states:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness * * *.

*ed States v. Kasto*, 584 F.2d 268, 271–72 (8th Cir.1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979); *cf.* Fed.R.Evid. 403 (allowing exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice).

*Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is consistent with this view. In that case, a juvenile testified on direct examination linking the defendant with a safe stolen from a bar. The defendant then sought to cross-examine the juvenile concerning two prior delinquency adjudications for burglary. The defendant argued that the jury could have inferred from the adjudications that the juvenile may have testified out of concern that his probation would be jeopardized or to shift suspicion away from himself. The Supreme Court held that it was constitutional error to deny the defendant the right to cross-examine concerning the juvenile adjudications.

In so holding, however, the Court noted that the precluded cross-examination concerned the "possible biases, prejudices, or ulterior motive of the witness as they may relate directly to the issues or personalities in the case at hand." *Id.* at 316, 94 S.Ct. at 1110. Such evidence, the Court found, is "always relevant as discrediting the witness and affecting the weight of his testimony." *Id.* In his concurrence, Justice Stewart emphasized that:

> the Court neither holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions.

*Id.* at 321, 94 S.Ct. at 1112–13.[27]

Applying *Davis* to a case very similar to the instant case, the Ninth Circuit found that evidence of a prior false accusation of rape made by the victim against a third party was intended to be used "to attack the general credibility of the victim on the basis of an unrelated prior incident."

*Hughes*, 641 F.2d at 793. In light of the minimal probative value of the prior accusation evidence, the Court held that the district court did not abuse its discretion prohibiting cross-examination on the subject. *Id.* at 792–93.

Similarly, in the instant case, we find that the evidence of the alleged prior false accusation of rape was offered solely to attack the general credibility of Janis. In addition, we agree with the district court that its probity in that regard is very weak. Accordingly, we hold that the district court properly refused to admit the evidence.

## F. Pre–Indictment Delay

█ Bartlett contends that the district court erred in refusing to dismiss the indictment for pre-indictment delay. In reversing the district court's original ruling granting Bartlett's motion for pre-indictment delay, this Court explicitly recognized the record before it at the time was limited and that at trial "there may be additional evidence presented that Bartlett sustained actual and substantial prejudice as a result of the loss of the witnesses." *Bartlett*, 794 F.2d at 1294. Therefore, we stated that "the district court is free to reevaluate whether the delay had caused Bartlett such prejudice as to impair the fairness of the trial." *Id.*

At the close of evidence in the trial, Bartlett's counsel moved the court to dismiss the case for pre-indictment delay. In support of the motion, he stated that the only additional prejudice to Bartlett not present when this Court originally considered the motion resulted from two factors. First, he represented that in the intervening period, Officer Lewis White, one of the law enforcement officials to whom Bartlett confessed to the incident, had suffered a stroke and had become unavailable as a witness.

The government contested Officer White's unavailability and stated to the court that "although Louis White was not present here physically, we've had a plane

27. This Court also recognized the distinction in *Kasto*, 584 F.2d at 271 n. 2. We pointed out that the probative value of evidence of the victim's prior sexual activity would be enhanced if it "tends to establish bias, prejudice, or an ulterior motive surrounding the charge of rape."

waiting and in an hour and a half notice we could have flown him here and he could have been present." Trial Transcript at 221. It is, however, unnecessary to resolve the conflict. Officer White's testimony, as revealed during the voluntariness hearing held in 1984, was not at all helpful to Bartlett. *See, e.g.,* Transcript of October 2, 1984, hearing at 29–30 (testimony of Officer White relating Bartlett's confession). In addition, the record indicates that Officer White's testimony would have substantially duplicated the testimony of Sheriff Schweitzer. *See, e.g., id.* at 40 (testimony of Sheriff Schweitzer relating Bartlett's confession). Thus, even assuming Officer White became unavailable as a witness, Bartlett would have suffered no "actual and substantial prejudice as a result." *Bartlett,* 794 F.2d at 1294.

Second, Bartlett's counsel argued that in the intervening period Tribal Court records were lost or destroyed. He contended that the records would have substantiated Bartlett's claim that Janis had falsely accused Frank Hawk Eagle of rape. Yet, in light of our holding concerning the admissibility of the alleged prior false accusation, it is difficult to discern the prejudice to Bartlett resulting from the loss of the records. Moreover, even assuming that the unavailability of the records somehow prejudiced Bartlett as to the false accusation issue, the prejudice would be no greater than that already taken into account in our prior opinion inasmuch as that opinion assumed Hawk Eagle's testimony would have been admissible. *See Bartlett,* 794 F.2d at 1292–93.

Thus, we hold that the district court did not err in finding that "there has been no showing that wasn't present or that would change the rationale and the legal conclusion * * * that there was no substantial * * * prejudice in conducting the defense," Trial Transcript at 221, and affirm its denial of Bartlett's motion to dismiss for pre-indictment delay.

### III.

Bartlett's case raises several very difficult and weighty issues. Resolution of those issues is complicated by the long and checkered procedural history of the case and by Bartlett's mental state, which can only be characterized as troubled. Indeed, at trial, there was essentially uncontradicted testimony that Bartlett "demonstrate[s] at times some significant distortions in the way he perceives what many of us view as reality." Trial Transcript at 190 (Testimony of Dr. Gannon).

Yet, Bartlett did not allege he was insane at the time of the acts charged and the district court found him competent to stand trial. Moreover, the record contains no evidence that the government sought to have Bartlett hospitalized pursuant to 18 U.S.C. § 4244, as one who has been found guilty of a crime but may presently "be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." *Id.* Similarly, the record contains no evidence that the director of the facility in which Bartlett is incarcerated has sought to transfer him to a more suitable facility for treatment, or that Bartlett would object to such a transfer. *Cf.* 18 U.S.C. § 4245 (providing for prisoner challenge to such a transfer).

Despite these facts, the presentence investigation report submitted by the probation service concludes: "Numerous psychiatric evaluations have found the defendant competent but schizophrenic. It would appear that Mr. Bartlett does not have the wherewithall to exist in the open society, consume his prescribed medications and exist without further unlawful behavior." Presentence Investigation Report at 7. Moreover, in its brief and again at oral argument, the government candidly stated that it based its decision to prosecute on assurances from state penal authorities that Bartlett continues to pose an unreasonable risk to society. *See* Brief of Appellee at 12–13.

Thus, the Court is concerned that, despite the fact that Bartlett has not been treated as mentally ill to this point, his release will be delayed because officials believe his psychiatric condition poses a substantial risk of harm to society. The

federal criminal law is not, however, a proper vehicle for dealing with those who, by reason of mental disorder, pose a risk to the community.[28] If Bartlett is currently suffering from a mental disease or defect, the recently enacted Insanity Defense Reform Act is clear that the director of the facility in which he is incarcerated may direct that he be transferred to a "suitable facility for care or treatment." 18 U.S.C. § 4245. If, during the course of such treatment, the director of the treatment facility certifies that Bartlett's sentence is about to expire and that he "is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another," 18 U.S.C. § 4246(a), then the government should follow the explicit procedures set forth by Congress in 18 U.S.C. § 4246.[29] In this manner, the interests of both society and Bartlett will be protected.

AFFIRMED.

---

**28.** Bartlett's sentence computation sheet compiled by the Bureau of Prisons and filed with this Court indicates that, with credit for time served in state custody, Bartlett first became eligible for parole on August 16, 1986 (a date prior to his federal conviction). The sheet also indicates that Bartlett should have had his initial parole hearing in April of 1988. In Bartlett's presentence investigation report, the probation service estimated that, under the Parole Commission's guidelines, Bartlett had an offense severity rating of seven and a salient factor score of nine, indicating a guideline range of between 52 and 80 months.

We, of course, recognize that the probation service's parole guidelines estimate is not binding on the Parole Commission and is based only upon the facts known by the probation service at the time it prepared the presentence investigation report. We also recognize that parole decisions ultimately rest with the Parole Commission, subject to appropriate review. Nonetheless, having reviewed the record, we find nothing other than Bartlett's troubled mental condition to warrant significant departure from the parole guidelines. Thus, assuming the accuracy of the probation service's parole guidelines estimate, we see no reason the Parole Commission, through the application of its guidelines, should not soon release Bartlett from custody.

**29.** After the director of the facility files the appropriate certificate with the district court, the offender's release is stayed. 18 U.S.C. § 4246(a). The court may then order a psychiatric or psychological examination of the offender and order that a report of the results be filed with the court. 18 U.S.C. § 4246(b). The court must then hold a hearing at which the defendant has the right to counsel, to testify, to present evidence and subpoena witnesses, and to confront and cross-examine witnesses. 18 U.S.C. § 4246(c); 18 U.S.C. § 4247(d). After the hearing, the court must release the offender unless it "finds by clear and convincing evidence that the [offender] is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to the property of another." 18 U.S.C. § 4246(d).